# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

FILED: MAY 1, 2017

No. 15-1063

UNITED STATES TELECOM ASSOCIATION,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

INDEPENDENT TELEPHONE & TELECOMMUNICATIONS
ALLIANCE, ET AL.,
INTERVENORS

———

Consolidated with 15-1078, 15-1086, 15-1090, 15-1091,
15-1092, 15-1095, 15-1099, 15-1117, 15-1128, 15-1151,
15-1164

———

On Petitions for Rehearing En Banc

———

Before: GARLAND*, *Chief Judge*; HENDERSON*, ROGERS,
TATEL**, BROWN***, GRIFFITH, KAVANAUGH***,
SRINIVASAN**, MILLETT, PILLARD*, and WILKINS, *Circuit
Judges*.

## **O R D E R**

The petitions for rehearing en banc, the responses thereto, and the brief of *amici curiae* were circulated to the full court, and a vote was requested. Thereafter, a majority of the judges eligible to vote did not vote in favor of the petitions. Upon consideration of the foregoing, it is

**ORDERED** that the petitions be denied.

### **Per Curiam**

**FOR THE COURT**:
Mark J. Langer, Clerk

**BY:** /s/
Ken Meadows
Deputy Clerk

\* Chief Judge Garland and Circuit Judges Henderson and Pillard did not participate in this matter.

\*\* A statement by Circuit Judge Srinivasan, joined by Circuit Judge Tatel, concurring in the denial of the petitions, is attached.

\*\*\* Circuit Judges Brown and Kavanaugh would grant the petitions. Separate statements by Circuit Judge Brown and Circuit Judge Kavanaugh, dissenting from the denial of the petitions, are attached.

SRINIVASAN, *Circuit Judge*, joined by TATEL, *Circuit Judge*, concurring in the denial of rehearing en banc:

In this case, a panel of our court upheld the FCC's 2015 Open Internet Order, commonly known as the net neutrality rule. The parties who unsuccessfully challenged the Order before the panel have now filed petitions seeking review by the full court sitting en banc. The court today denies en banc review. En banc review would be particularly unwarranted at this point in light of the uncertainty surrounding the fate of the FCC's Order. The agency will soon consider adopting a Notice of Proposed Rulemaking that would replace the existing rule with a markedly different one. *See* In re Restoring Internet Freedom, FCC (Apr. 27, 2017), https://apps.fcc.gov/edocs_public/attachmatch/DOC-344614A 1.pdf. In that light, the en banc court could find itself examining, and pronouncing on, the validity of a rule that the agency had already slated for replacement.

While we concur in the court's denial of en banc review, we write to respond to a particular contention pressed by one of our dissenting colleagues: that the FCC's Order, and thus our panel decision sustaining it, departs from controlling Supreme Court precedent in two distinct ways. First, our colleague submits that Supreme Court decisions require clear congressional authorization for rules like the net neutrality rule, and the requisite clear statutory authority, he argues, is absent here. *See infra* at 3-18 (Kavanaugh, J., dissenting); *accord infra* at 18-23 (Brown, J., dissenting). Second, our colleague contends that the rule conflicts with Supreme Court decisions ostensibly arming internet service providers (ISPs) with a First Amendment shield against net neutrality obligations. *See infra* at 19-36 (Kavanaugh, J., dissenting).

Respectfully, both lines of argument are misconceived. As to the first, the Supreme Court, far from precluding the FCC's Order due to any supposed failure of congressional

authorization, has pointedly recognized the agency's authority under the governing statute to do precisely what the Order does. As to the second, no Supreme Court decision supports the counterintuitive notion that the First Amendment entitles an ISP to engage in the kind of conduct barred by the net neutrality rule—i.e., to hold itself out to potential customers as offering them an unfiltered pathway to any web content of *their* own choosing, but then, once they have subscribed, to turn around and limit their access to certain web content based on the *ISP's* own commercial preferences.

Before taking up the merits of those two issues, we first emphasize the role in which we examine them. The wisdom of the net neutrality rule was, and remains, a hotly debated matter. The FCC received the views of some four million commenters before adopting the rule, In re Protecting and Promoting the Open Internet, 30 FCC Rcd. 5601, 5604 ¶ 6 (2015) (Order), and the debate over the rule continues to this day, with the agency now poised to consider replacing it. We have no involvement in that ongoing debate. Our task is not to assess the advisability of the rule as a matter of policy. It is instead to assess the permissibility of the rule as a matter of law. Does the rule lie within the agency's statutory authority? And is it consistent with the First Amendment? The answer to both questions, in our view, is yes.

I.

According to our dissenting colleague, the FCC's Order runs afoul of a doctrine he gleans from certain Supreme Court decisions invalidating an agency rule as lying outside the agency's congressionally delegated authority. Our colleague understands those decisions to give rise to a "major rules" doctrine. That doctrine is said to embody the following understanding about the scope of agencies' delegated

authority: while agencies are generally assumed to possess authority under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), to issue rules resolving statutory ambiguities, an agency can issue a *major* rule—i.e., one of great economic and political significance—only if it has clear congressional authorization to do so. *See infra* at 4-5 (Kavanaugh, J., dissenting). Our other dissenting colleague generally agrees with this line of argument (although she calls the doctrine the "major questions" doctrine rather than the "major rules" doctrine). *See infra* at 18-20 (Brown, J., dissenting).

We have no need in this case to resolve the existence or precise contours of the major rules (or major questions) doctrine described by our colleagues. Assuming the existence of the doctrine as they have expounded it, and assuming further that the rule in this case qualifies as a major one so as to bring the doctrine into play, the question posed by the doctrine is whether the FCC has clear congressional authorization to issue the rule. The answer is yes. Indeed, we know Congress vested the agency with authority to impose obligations like the ones instituted by the Order because the Supreme Court has specifically told us so.

The pertinent decision is *National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967 (2005). That case, like this one, addressed the proper regulatory classification under the Communications Act of broadband internet service. *Brand X* involved the provision of broadband internet access via cable systems. At the time of the decision, cable broadband was one of two types of broadband service available to customers, the other being DSL (digital subscriber line). *See id.* at 975.

The FCC had applied a different form of regulatory treatment to cable broadband service than to DSL service. The agency had classified DSL as a "telecommunications service" for purposes of the Communications Act. *See id.* at 975, 1000. That classification carries significant statutory consequences. The Act requires treating telecommunications providers as common carriers presumptively subject to the substantial regulatory obligations attending that status. *See id.* at 975-76. Common carriers, for instance, generally must afford neutral, nondiscriminatory access to their services, and must avoid unjust and unreasonable practices in that connection. *See id.* at 975-76, 1000.

Whereas the FCC had classified DSL broadband as a telecommunications service, the agency had instead elected to classify cable broadband as an "information service," the other of the two classifications available to the agency under the statute. *See id.* at 978. Providers of an information service, in contrast with telecommunications providers, are not considered to be common carriers under the Act. As a result, providers of an information service are subject to less extensive regulatory obligations and oversight than are telecommunications providers. *See id.* at 975-76.

The issue in *Brand X* was whether the Communications Act compelled the FCC to classify cable broadband ISPs as telecommunications providers subject to regulatory treatment as common carriers. The Court answered that question no. Critically for our purposes, though, the Court made clear in its decision—over and over—that the Act left the matter to the agency's discretion. In other words, the FCC *could* elect to treat broadband ISPs as common carriers (as it had done with DSL providers), but the agency did not *have* to do so.

The Court, to that end, explained that it had "no difficulty concluding that *Chevron* applie[d]" to the agency's decision to classify cable broadband as an information service rather than a telecommunications service. *Id.* at 982. The statute's "silence" on the matter left the Commission "discretion to fill the consequent statutory gap." *Id.* at 997. That meant the question "would be resolved, first and foremost, by the agency." *Id.* at 982 (internal quotation marks omitted); *see id.* at 980-81. The Court repeatedly emphasized the Commission's authority to use "its expert policy judgment to resolve these difficult questions." *Id.* at 1003. In that light, the proper classification of broadband service would turn "on the factual particulars of how Internet technology works and how it is provided, questions *Chevron* leaves to the Commission to resolve in the first instance." *Id.* at 991.

Consequently, the Court held, the court of appeals in *Brand X* had "erred in refusing to apply *Chevron* to the Commission's interpretation of the definition of 'telecommunications service,'" and in declining to defer to the agency's decision to treat cable broadband as an information service. *Id.* at 984 (quoting 47 U.S.C. § 153(46) (2000) (currently codified at 47 U.S.C. § 153(53)). But deference equally would have been owed, the Supreme Court made clear, if the FCC had reached the opposite resolution by classifying cable broadband providers as telecommunications carriers. That is because the agency had only two regulatory classifications available to it. To affirm the FCC's statutory discretion to select between them was necessarily to countenance the agency's treatment of cable broadband as a telecommunications service.

Indeed, the Court went as far as to affirmatively "leave[]] untouched" the court of appeals's belief that the better reading of the statute—albeit not the one that had been adopted by the

agency—called for treating broadband providers as telecommunications carriers. *Id.* at 985-86. And the Court fully understood the significant regulatory implications if the agency were instead to make that choice: classification as a telecommunications service "would require applying presumptively mandatory Title II [i.e., common carrier] regulation to all ISPs." *Id.* at 995 n.2.

The concurring and dissenting opinions in *Brand X* reinforced the majority's recognition of the agency's statutory authority to subject ISPs to regulation as common carriers. Justice Breyer's concurring opinion concluded that the FCC's decision to classify cable broadband as an information service fell "within the scope of its statutorily delegated authority—though perhaps just barely." *Id.* at 1003 (Breyer, J., concurring). If the FCC's election *not* to impose common carrier obligations on cable broadband ISPs "just barely" fell within the agency's discretion, the opposite choice necessarily would have fallen comfortably within the agency's congressionally delegated authority.

Justice Scalia's dissenting opinion, joined by Justices Souter and Ginsburg, went even further. According to Justice Scalia, the statute permitted only one conclusion: cable broadband ISPs "are subject to Title II regulation as common carriers, like their chief competitors [e.g., DSL] who provide Internet access through other technologies." *Id.* at 1006 (Scalia, J., dissenting). The agency, in Justice Scalia's view, had no discretion to conclude otherwise. And he expressly accepted that his reading of the Act would result in "common-carrier regulation of all ISPs," a result he considered "not a worry." *Id.* at 1011. (He noted, though, that the agency possessed statutory authority to forbear from applying the full range of common carrier regulatory obligations, *id.* at 1011-

12, an authority the FCC exercised when it fashioned the rule we now review, *see* Order ¶¶ 434-532.)

The upshot of *Brand X* with regard to the FCC's congressionally delegated authority over broadband ISPs is unmistakable and straightforward. All nine Justices recognized the agency's statutory authority to institute "common-carrier regulation of all ISPs," with some Justices even concluding that the Act left the agency with no other choice. 545 U.S. at 1011 (Scalia, J., dissenting). In the Order under review, the agency took up the *Brand X* Court's invitation. It decided to classify broadband ISPs as telecommunications providers, enabling it to impose common carrier obligations on ISPs such as the net neutrality rule in question here.

In light of *Brand X*, our dissenting colleague's reliance on the "major rules" doctrine cannot carry the day. Recall that the doctrine ultimately embodies an understanding about congressional authorization: an agency, the doctrine says, can adopt a major rule only if it clearly possesses congressional authorization to do so. The major question at issue here, according to our colleague, is whether the FCC can subject broadband ISPs to common carrier obligations. *See infra* at 12-13 (Kavanaugh, J., dissenting). If we assume that the FCC's decision to treat broadband ISPs as common carriers amounts to a major rule, the question then is whether the agency clearly has authority under the Act to make that choice. In *Brand X*, the Supreme Court definitively—and authoritatively, for our purposes as an inferior court—answered that question yes.

It bears emphasis in this regard that, by the time of *Brand X*, two of the Supreme Court decisions cited by the dissent as exemplars of the major rules doctrine—*MCI*

*Telecommunications Corp. v. Am. Telephone & Telegraph Co.*, 512 U.S. 218 (1994), and *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000)—had already been decided. *Brown & Williamson* is particularly notable. There, the Supreme Court considered the FDA's exercise of its general rulemaking authority under the Food, Drug, and Cosmetic Act to regulate the use of tobacco products by children and adolescents. The Court, although applying principles of *Chevron* deference to the FDA's assertion of authority over tobacco products, concluded that Congress did not "delegate a decision of such economic and political significance to an agency in so cryptic a fashion." *Id.* at 160.

Later, in *Brand X*, the Court reached a different conclusion about the FCC's regulatory authority over ISPs. The Court, again applying *Chevron*, this time concluded that Congress had authorized the agency to decide whether to regulate ISPs as common carriers. As between the two possible classifications, "the Commission's choice of one of them is entitled to deference." *Brand X*, 545 U.S. at 989.

We note, further, that there is no material difference between the technology considered in *Brand X* and the technology at issue here. The petitioning parties have contended throughout this case that *Brand X* involved only something referred to as the "last mile" of internet service. But the panel straightforwardly (and unanimously) rejected their effort to make anything of that supposed distinction. *See U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 702 (D.C. Cir. 2016); *id.* at 745 (Williams, J., concurring in part and dissenting in part). Our dissenting colleague likewise makes no effort to distinguish *Brand X* on such a basis. Rather, both cases involve "the FCC's authority to classify Internet service as a telecommunications service." *Infra* at 17 (Kavanaugh, J., dissenting); *but see infra* 22-23 (Brown, J., dissenting). And

*Brand X*, in clearly recognizing the agency's authority to do so under the Act, negates any argument under the major rules doctrine that the FCC lacked statutory authority to issue the Order we now review.

Our dissenting colleague nonetheless contends that *Brand X* poses no obstacle to invalidating the FCC's Order under the major rules doctrine. His argument runs as follows. The question under the major rules doctrine, he observes, is whether Congress has "clearly authorized the FCC to subject Internet service providers to the range of burdensome common-carrier regulations associated with telecommunications services." *Infra* at 16 (Kavanaugh, J., dissenting). But the *Brand X* Court, he then notes, found the statute "ambiguous about whether Internet service was an information service or a telecommunications service." *Id.* at 17. In his view, "*Brand X*'s finding of ambiguity by definition means that Congress has not clearly authorized the FCC to issue the net neutrality rule." *Id.* at 18.

That analysis rests on a false equivalence: it incorrectly equates two distinct species of ambiguity. It is one thing to ask whether "Internet service is *clearly* a telecommunications service under the statute." *Id.* at 16. It is quite another thing to ask whether Congress has "clearly authorized the FCC to classify Internet service as a telecommunications service," which is the relevant question under our colleague's understanding of the major rules doctrine. *Id.* The former question asks whether the statute *itself* clearly classifies ISPs as telecommunications providers. The latter asks whether the statute clearly authorizes the *agency* to classify ISPs as telecommunications providers.

Our colleague assumes that, if the answer to the former question is no, "that is the end of the game for the net

neutrality rule." *Id*. at 17. Not at all. A negative answer to the former question hardly dictates a negative answer to the latter, more salient, one. The statute itself might be ambiguous about whether ISPs are to be treated as common carriers, but still be clear in authorizing the agency to resolve the question.

Indeed, that dichotomy perfectly captures *Brand X*'s holding. Justice Scalia, in dissent, believed that the statute clearly compelled treating ISPs as telecommunications providers. The majority disagreed, finding the statute ambiguous on the question. But the majority found that the agency was empowered to resolve the ambiguity—i.e., to decide whether ISPs should be classified as telecommunications providers presumptively subject to common carrier obligations. In short, whereas *Brand X* found statutory ambiguity on whether ISPs are telecommunications providers, the decision found no statutory ambiguity on whether the FCC gets to answer that question.

So understood, *Brand X* dictates rejecting our dissenting colleague's argument based on the major rules doctrine. It is thus perhaps unsurprising that none of the petitioning parties, no member of the original panel (including our colleague who dissented in part at the panel stage), and neither of the dissenting Commissioners objected to the FCC's Order as infringing any such doctrine. (We note, though, that a group of intervenors led by TechFreedom makes such an argument.) The major rules doctrine is said to promote separation-of-powers principles by assuring that Congress has delegated authority to an Executive agency to decide a major matter of policy. *See infra* at 3-5 (Kavanaugh, J., dissenting). But in light of *Brand X*'s recognition of the FCC's congressionally delegated authority to decide whether to regulate ISPs as common carriers, it would disserve—not promote—the

separation of powers to deny the agency the authority conferred on it by Congress.

In the end, the major rules doctrine, as articulated by our colleague, affords no basis for invalidating the net neutrality rule. The Supreme Court decisions ostensibly giving rise to that doctrine lie far afield from this case. They involve, per our colleague's description, "regulating cigarettes, banning physician-assisted suicide, eliminating telecommunications rate-filing requirements, or regulating greenhouse gas emitters." *Id.* at 9. The Court's decision in *Brand X*, by contrast, involved the same statute (the Communications Act), the same agency (the FCC), the same factual context (the provision of broadband internet access), and the same issue (whether broadband ISPs are telecommunications providers, and hence common carriers, under the Act). *Brand X* unambiguously recognizes the agency's statutorily delegated authority to decide that issue.

Does *Brand X*, then, necessarily validate the agency's decision to classify broadband ISPs as telecommunications providers and to subject them to common carrier obligations? No, it does not. While *Brand X* recognizes the FCC's statutory authority to treat broadband ISPs as common carriers, the agency must carry out its authority in a reasonable and non-arbitrary way. The partial dissent from the panel's disposition believed that the FCC's Order fell short on those grounds, and the petitioning parties have raised a host of challenges to the agency's decisionmaking process and outcome. The panel majority concluded otherwise and upheld the rule.

But while *Brand X* could not have settled the validity of a rule the FCC had yet to promulgate, it did settle the agency's authority to classify broadband ISPs as telecommunications

providers under the Communications Act. The major rules doctrine, as conceptualized by our dissenting colleague, is a heuristic for determining whether a given rule falls within an agency's congressionally delegated authority. Once the Supreme Court says that a rule does so—as *Brand X* did with regard to the FCC's authority to treat ISPs as common carriers—our inquiry is over. Insofar as the FCC's Order involves a major rule, then, *Brand X* resolves the agency's statutory authority to adopt it.

## II.

Our dissenting colleague separately argues that the First Amendment poses an independent bar to the FCC's Order. The Order, he submits, infringes the First Amendment rights of broadband ISPs. Specifically, he understands Supreme Court precedent to recognize a First Amendment entitlement on the part of an ISP to block its subscribers from accessing certain internet content based on the ISP's own preferences, even if the ISP has held itself out as offering its customers an indiscriminate pathway to internet content of their own—not the ISP's—choosing.

Under that view, an ISP, for instance, could hold itself out to consumers as affording them neutral, indiscriminate access to all websites, but then, once they subscribe, materially degrade their ability to use Netflix for watching video—or even prevent their access to Netflix altogether—in an effort to steer customers to the ISP's own competing video-streaming service. Alternatively, an ISP, again having held itself out as affording its customers an unfiltered conduit to internet content, could block them from accessing (or significantly delay their ability to load) the *Wall Street Journal*'s or the *New York Times*'s website because of a

disagreement with the views expressed on one or the other site.

An ISP has no First Amendment right to engage in those kinds of practices. No Supreme Court decision suggests otherwise. Indeed, although the two dissenting FCC Commissioners objected to the agency's adoption of the rule on multiple grounds, neither suggested the rule poses any First Amendment issue. Similarly, the principal parties challenging the Order in this court, who collectively represent virtually every broadband provider—including all of the major ISPs—bring no First Amendment challenge to the rule. The sole party to raise any claim under the First Amendment is Alamo Broadband Inc., which describes itself as "a small broadband provider" serving some 1,000 customers in Texas, and which is joined in its claim by an individual named Daniel Berninger. Pet'rs' Joint Proposed Briefing Format & Sched. 8; Alamo Br. 3.

Notwithstanding the arguments presented by Alamo and Berninger—and now also our dissenting colleague—the consensus view is correct: the net neutrality rule raises no issue under the First Amendment. The key to understanding why lies in perceiving when a broadband provider falls within the rule's coverage. As the Order explains, broadband ISPs that are subject to the rule "sell retail customers the ability to go anywhere (lawful) on the Internet"—they "represent[] that they will transport and deliver traffic to and from all or substantially all Internet endpoints." Order ¶ 27; *see id.* ¶¶ 15, 350. They "display no . . . intent to convey a message in their provision" of internet access, *id.* ¶ 549, as would be necessary "to bring the First Amendment into play," *Texas v. Johnson*, 491 U.S. 397, 404 (1989).

14

In particular, "[b]roadband providers" subject to the rule "represent that their services allow Internet end users to access all or substantially all content on the Internet, *without alteration, blocking, or editorial intervention*." *Id.* ¶ 549 (emphasis added). Customers, "in turn, expect that they can obtain access to all content available on the Internet, *without the editorial intervention of their broadband provider*." *Id.* (emphasis added). Therefore, as the panel decision held and the agency has confirmed, the net neutrality rule applies only to "those broadband providers that hold themselves out as neutral, indiscriminate conduits" to any internet content of a subscriber's own choosing. *U.S. Telecom Ass'n*, 825 F.3d at 743; *see* FCC Opp'n Pets. Reh'g 28-29.

For a broadband ISP that holds itself out to consumers as a "neutral, indiscriminate conduit"—i.e., as a pathway to "all content on the Internet, without alteration, blocking, or editorial intervention," Order ¶ 549—the rule requires the ISP to abide by its representation and honor its customers' ensuing expectations. The ISP therefore cannot block its subscribers' access to certain websites based on its own preferences. Nor can it engage in "throttling," which, while stopping short of outright blocking, degrades a user's experience with selected content so as to render it largely, even if not technically, "unusable." *Id.* ¶ 17. Nor can an ISP create "fast lanes" favoring content providers who pay the ISP (or with whom it has a commercial affiliation), while relegating disfavored (i.e., nonpaying) providers to "slow lanes." *Id.* ¶¶ 18, 126. Like blocking and throttling, paid prioritization practices of that variety are incompatible with a promise to provide a neutral, indiscriminate pathway to content of a customer's own choosing.

The upshot of the FCC's Order therefore is to "fulfill the reasonable expectations of a customer who signs up for a

broadband service that promises access to all of the lawful Internet" without editorial intervention. *Id.* ¶¶ 17, 549. The FCC found that, once a consumer subscribes to a particular broadband service in reliance on such a promise, she faces high switching costs constraining her ability to shift away from her ISP if it reneges on its representation by blocking her access to select content. *See id.* ¶¶ 80-82, 97-99. The agency further explained that a subscriber might well have no awareness of her ISP's practices of that kind in the first place: she may have no reason to suppose that her inability to access a particular application, or that the markedly slow speeds she confronts when attempting to use it, derives from her ISP's choices rather than from some deficiency in the application. *See id.* ¶¶ 81, 99. After all, if a subscriber encounters frustratingly slow buffering of videos when attempting to use Netflix, why would she naturally suspect the fault lies with her ISP rather than with Netflix itself?

While the net neutrality rule applies to those ISPs that hold themselves out as neutral, indiscriminate conduits to internet content, the converse is also true: the rule does not apply to an ISP holding itself out as providing something other than a neutral, indiscriminate pathway—i.e., an ISP making sufficiently clear to potential customers that it provides a filtered service involving the ISP's exercise of "editorial intervention." *Id.* ¶ 549. For instance, Alamo Broadband, the lone broadband provider that raises a First Amendment challenge to the rule, posits the example of an ISP wishing to provide access solely to "family friendly websites." Alamo Pet. Reh'g 5. Such an ISP, as long as it represents itself as engaging in editorial intervention of that kind, would fall outside the rule. *See U.S. Telecom Ass'n*, 825 F.3d at 743; FCC Opp'n Pets. Reh'g 28-29; FCC Br. 146 n.53. The Order thus specifies that an ISP remains "free to

offer 'edited' services" without becoming subject to the rule's requirements. Order ¶ 556.

That would be true of an ISP that offers subscribers a curated experience by blocking websites lying beyond a specified field of content (e.g., family friendly websites). It would also be true of an ISP that engages in other forms of editorial intervention, such as throttling of certain applications chosen by the ISP, or filtering of content into fast (and slow) lanes based on the ISP's commercial interests. An ISP would need to make adequately clear its intention to provide "edited services" of that kind, *id.* ¶ 556, so as to avoid giving consumers a mistaken impression that they would enjoy indiscriminate "access to all content available on the Internet, without the editorial intervention of their broadband provider," *id.* ¶ 549. It would not be enough under the Order, for instance, for "consumer permission" to be "buried in a service plan—the threats of consumer deception and confusion are simply too great." *Id.* ¶ 19; *see id.* ¶ 129.

There is no need in this case to scrutinize the exact manner in which a broadband provider could render the FCC's Order inapplicable by advertising to consumers that it offers an edited service rather than an unfiltered pathway. No party disputes that an ISP could do so if it wished, and no ISP has suggested an interest in doing so in this court. That may be for an understandable reason: a broadband provider representing that it will filter its customers' access to web content based on its own priorities might have serious concerns about its ability to attract subscribers. Additionally, such a provider, by offering filtered rather than indiscriminate access, might fear relinquishing statutory protections against copyright liability afforded to ISPs that act strictly as conduits to internet content. *See* 17 U.S.C. § 512; *Recording Indus.*

*Ass'n of Am., Inc. v. Verizon Internet Servs., Inc.*, 351 F.3d 1229, 1233, 1237 (D.C. Cir. 2003).

In the event that an ISP nonetheless were to choose to hold itself out to consumers as offering them an edited service rather than indiscriminate internet access—despite the potential effect on its subscriber base—it could then bring itself outside the rule. In that sense, the rule could be characterized as "voluntary," *infra* at 25-26 n.8 (Kavanaugh, J., dissenting), but in much the same way that just about any regulation could be considered voluntary, insofar as a regulated entity could always transform its business to such an extent that it is no longer in the line of business covered by the regulation.

Here, it would be no small matter for an ISP to decide to present itself to potential customers as providing a fundamentally different product—an edited service—than the neutral, indiscriminate access generally promised by ISPs and expected by consumers as standard service. No ISP has indicated in this court a desire to represent itself to consumers as affording them less of a "go wherever *you*'d like to go" service and more of a "go where *we*'d like you to go" service. Accordingly, Alamo Broadband, the only ISP to raise a First Amendment claim, makes no argument that it holds itself out as offering filtered access to web content, as opposed to offering an indiscriminate pathway to any content of its subscribers' own choosing. Alamo nonetheless claims a First Amendment entitlement to filter its subscribers' access to web content through blocking, throttling, and paid prioritization measures.

Alamo contends, for instance, that a broadband provider has a First Amendment right to provide faster access to its own video-streaming service than to a competing product.

Alamo Reh'g Pet. 9. If so, an ISP could similarly afford fast-lane access (because paid to do so) to a particular service that sells tickets to concert events while degrading access to Ticketmaster, even though a customer might lose out on preferred seats while waiting for Ticketmaster to work. The same would be true of measures favoring (or disfavoring) specific ride-sharing applications (e.g., Uber), travel websites (e.g., Expedia), or video-chat services (e.g., Skype), potentially causing customers, respectively, to wait longer for rides, to miss out on flight reservations at fares available for a limited period, or to fail to connect with family or friends for face-to-face interactions. Alternatively, the ISP could simply block access altogether rather than merely slow it down.

In all of those situations, an ISP would have held itself out as offering its customers unfiltered access to all internet content, but then would prevent them from accessing—or otherwise impair their ability to use—selected content it disfavors. The First Amendment does not give an ISP the right to present itself as affording a neutral, indiscriminate pathway but then conduct itself otherwise. The FCC's Order requires ISPs to act in accordance with their customers' legitimate expectations. Nothing in the First Amendment stands in the way of establishing such a requirement in the form of the net neutrality rule.

Contrary to our dissenting colleague's argument, the Supreme Court's *Turner Broadcasting* decisions do not grant ISPs a First Amendment shield against the net neutrality rule's obligations. *See infra* at 21-23 (Kavanaugh, J., dissenting). Those decisions arose in a markedly different context. They addressed the validity under the First Amendment of statutory "must-carry" requirements calling for cable television operators to "devote a portion of their channels to the transmission of local broadcast television

stations." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 626, 630 (1994); *see Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180 (1997).

The Supreme Court ultimately upheld the must-carry obligations. In the process of doing so, however, the Court recognized that a cable operator's choices about which programming to carry on its channels implicate the First Amendment's protections. That is because a cable operator engages in protected First Amendment activity when it "exercis[es] editorial discretion over which stations or programs to include in its repertoire." *Turner Broad.*, 512 U.S. at 636 (internal quotation marks omitted).

The same cannot be said of broadband providers subject to the FCC's Order. Whereas a cable operator draws the protections of the First Amendment when it exercises editorial discretion about which programming to carry, an ISP falling within the net neutrality rule represents that it gives subscribers indiscriminate access to internet content without any editorial intervention. Cable operators, that is, engage in editorial discretion; ISPs subject to the net neutrality rule represent that they do not. The very practice bringing cable operators within the fold of the First Amendment's protections is inapplicable in the case of broadband providers subject to the net neutrality rule.

For that reason, our dissenting colleague gains little by emphasizing that the same cable operators recognized to have First Amendment interests at stake in *Turner Broadcasting* also serve as broadband ISPs. *See infra* at 23 (Kavanaugh, J., dissenting). Our colleague thinks it entirely illogical to conclude that those entities receive First Amendment protection when transmitting television programming under must-carry obligations but not when transmitting internet

content under the net neutrality rule. The distinction becomes entirely understandable, however, upon recognizing that cable operators exercise editorial discretion in the former situation but disclaim any exercise of editorial intervention in the latter.

Indeed, the cable operators themselves evidently appreciate a distinction. In *Turner Broadcasting*, the party standing in the shoes of cable operators, presenting oral argument and briefing on their behalf, was NCTA (which then stood for National Cable Television Association). *See* 520 U.S. at 184; 512 U.S. at 625. Here, NCTA again represents cable operators, this time in their capacity as broadband providers. *See, e.g.*, *U.S. Telecom Ass'n*, 825 F.3d at 687. In *Turner Broadcasting*, NCTA persuaded the Court that cable operators engage in protected First Amendment activity when selecting the television programming to include in their channel lineups. Yet here, the very same party—tellingly—raises no First Amendment challenge at all. It says quite a lot when the party that presumably understands better than anyone the import of the *Turner Broadcasting* decisions for cable operators apparently perceives no viable First Amendment objection to the net neutrality rule under those decisions. (That NCTA may have raised First Amendment concerns about previous net neutrality obligations, *see infra* 28 n.9 (Kavanaugh, J., dissenting), only magnifies its decision to forgo any such objection to the current rule.)

Our dissenting colleague presents a number of associated arguments emanating from his belief that *Turner Broadcasting* vests broadband providers with First Amendment protections when they block and throttle internet content. Those arguments, however, tend to fall away once one understands—as cable operators themselves evidently do—the inapplicability of *Turner Broadcasting* to this case.

As an example, our colleague rejects what he perceives to be the FCC's "use it or lose it" conception of First Amendment rights. *See infra* at 24 (Kavanaugh, J., dissenting). But the chief reason the net neutrality rule raises no First Amendment problem is not that ISPs have lost their First Amendment rights by refraining from actively filtering the internet content they transmit to subscribers. The lack of a viable First Amendment claim stems from what ISPs have (or have not) *said*, not from what they have (or have not) *done*. When a broadband provider holds itself out as giving customers neutral, indiscriminate access to web content of their own choosing, the First Amendment poses no obstacle to holding the provider to its representation. That amounts to an "if you say it, do it" theory, not a "use it or lose it" theory.

Our dissenting colleague likewise errs in fearing a slippery slope under which the government could require widely used web platforms such as Facebook, Google, Twitter, and YouTube, or a widely used commercial marketplace such as Amazon, to accept or promote all relevant content on nondiscriminatory terms. *See infra* at 25, 33 (Kavanaugh, J., dissenting). Those companies evidently do not share our colleague's concern—all but one is a member of a group that supports the rule in this court. *See* Internet Association Amicus Br. in Support of Resp'ts iv. That may be in part because those companies, in contrast with broadband ISPs, are not considered common carriers that hold themselves out as affording neutral, indiscriminate access to their platform without any editorial filtering. If an agency sought to impose such a characterization on them, they would presumably disagree. Here, by contrast, the rule applies only to ISPs that represent themselves as neutral, indiscriminate conduits to internet content, and no ISP subject to the rule—including Alamo Broadband—has disclaimed that characterization in this court.

The real slippery-slope concerns run in the reverse direction. Under our dissenting colleague's approach, broadband ISPs would have a First Amendment entitlement to block and throttle content based on their own commercial preferences even if they had led customers to anticipate neutral and indiscriminate access to all internet content. There is no apparent reason the same conclusion would not also obtain in the case of telephone service, which, like broadband service, is classified as common carriage.

Imagine if a telephone provider held itself out as an indiscriminate conduit for phone communications but wished to block or impair access to select endpoints based on the provider's own editorial preferences. A telephone company might, for example, restrict access to certain numbers based on political affiliation or other criteria. The company would have an entitlement to do so under our colleague's understanding of the First Amendment.

Our colleague suggests that telephone companies differ from broadband providers in that they generally do not carry "mass communications." *Infra* at 34 n.13 (Kavanaugh, J., dissenting). But speech directed to a finite audience is no less protected than speech available on a broader scale. And the category of "mass communications," in any event, is hardly self-defining. One can readily envision circumstances in which telephone service would fairly be considered to involve mass communication (text messages or recorded voice messages designed to reach a broad audience, for instance). Our colleague's understanding of broadband providers' First Amendment rights would arm telephone companies with parallel rights to block or filter phone service, contradicting a long history of uncontroversial regulation of that service.

For all of those reasons, broadband ISPs have no First Amendment entitlement to hold themselves out as indiscriminate conduits but then to act as something different. The net neutrality rule assures that broadband ISPs live up to their promise to consumers of affording them neutral access to internet content of their own choosing. The rule, in doing so, does not infringe the First Amendment.

BROWN, *Circuit Judge*, dissenting from the denial of rehearing *en banc*: An independent federal agency sits at the intersection of the road to the White House and Constitution Avenue. Two statues that capture struggle between man and horse flank the agency. The statues are called "Man Controlling Trade," and they depict a man, the government, restraining a horse, the marketplace. Though the statues look similar, they are not the same. On the President's road, the horse—the marketplace—looks threatening, as if it will topple the brawny man trying to grasp the reins. On *Constitution* Avenue, the man—the government—is the threatening one, grasping the reins on both sides of the animal's head; it appears he is trying to overpower a valiant and sympathetic horse. Here, as with the statues, an independent agency sits at the crossroads of competing visions—the President's view of the Internet as threatening consumers, and the libertarian view of government as strangling the greatest market innovation of the last century. But an orthodox view of checks and balances leaves the choice of vision to Congress.

Congress passed, and President Clinton signed, the Telecommunications Act of 1996 (the "Act"), and its meaning could not be clearer: "to preserve the vibrant and competitive free market that presently exists for the Internet . . ., *unfettered by Federal or State regulation*." 47 U.S.C. § 230(b)(2) (emphasis added). For nearly two decades, the federal government respected the Act's deregulatory policy. Presidents enforced it, Congresses did not alter it, and the Federal Communications Commission ("FCC" or the "Commission") gave the Internet only a light-touch regulation. When FCC regulation went beyond a light touch, this Court intervened. *See Verizon v. FCC*, 740 F.3d 623, 629–30, 650–59 (D.C. Cir. 2014). However, the regulatory proposal now before the Court seeks to end this longstanding consensus.

When the FCC followed the *Verizon* "roadmap" to implement "net neutrality" principles without heavy-handed

regulation of Internet access, the Obama administration intervened. Through covert and overt measures, FCC was pressured into rejecting this decades-long, light-touch consensus in favor of regulating the Internet like a public utility. This sea change places the Commission in control of Internet access. G. Nagesh & B. Mullins, *Net Neutrality: How White House Thwarted FCC Chief*, WALL ST. J. (Feb. 4, 2015).

Abandoning Congress's clear, deregulatory policy does more than subject Internet access to a regulatory framework fit for the horse and buggy. The FCC's statutory rewrite relegates the Constitution's vital separation of powers framework to "a mere parchment delineation of the boundaries;" a hollow guarantee of liberty. *See* THE FEDERALIST NO. 73 (Hamilton), p. 441 (Clinton Rossiter ed., 1961). If we take the Constitution's structural restraints seriously, we cannot wish the Commission *bon voyage* on its Presidentially-imposed journey to become the Federal Cyberspace Commission. As that is exactly what the Court's Opinion does, I respectfully dissent from the denial of rehearing *en banc*.[1]

## I.

*The Act's Deregulatory Structure*

---

[1] The Judges concurring in today's denial of rehearing note "[t]he [FCC] will soon consider adopting a Notice of Proposed Rulemaking that would replace the existing rule with a markedly different one." Concurral at 1. For this reason, they consider *en banc* review "particularly unwarranted at this point." *Id.* Of course, *en banc* review is not now at issue. The motions to rehear this case were filed in August of *last year* when rehearing would certainly have been appropriate. Moreover, regardless of any future FCC action, the broad implications of this Court's Panel Opinion remain; Supreme Court involvement may yet be warranted.

Congress passed the Telecommunications Act of 1996 to amend the Communications Act of 1934, and in doing so, protect the innovation animating the Internet. *See* Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996) ("An Act [t]o promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies."). The Act found that the "Internet and other interactive computer services have flourished, to the benefit of all Americans, *with a minimum of government regulation*." 47 U.S.C. § 230(a)(4) (emphasis added). Accordingly, Congress made keeping the Internet "unfettered" by "regulation" our national policy. *Id.* § 230(b)(2). Achieving this policy required a commitment to deregulatory tools and standards. The Act provided exactly that.

*A.*

*Internet Access As An Information Service*

As the Supreme Court explained, the 1996 Act incorporated FCC's prior practice of distinguishing "basic services," which are provided by "telecommunications services," and "enhanced services," which are provided by "information services." *See National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967, 975–77 (2005) ("*Brand X*"). "These two statutory classifications originated in the late 1970's, as the Commission developed rules to regulate data-processing services offered over telephone wires." *Id.* at 976.

"Basic services," the analogue to the 1996 Act's "telecommunications services," were defined as "a pure transmission capability over a communications path that is

virtually transparent in terms of its interaction with customer supplied information." *Id.* *"[N]o computer processing or storage of the information" was part of "basic services,"* "other than the processing or storage needed to convert the message into electronic form and then back into the ordinary language for purposes of transmitting it over the network— such as a telephone or facsimile." *Id.* (emphasis added). The FCC, and then Congress in 1996, subjected these "basic services," these "telecommunications services," to common carrier regulation. *Id.*

"Enhanced services" are the analogue to "information services" in the 1996 Act, and they are not subject to common carrier regulation. *Id.* at 977. The Commission historically defined "enhanced services" to be those where "computer processing applications [were] used to act on the content, code, protocol, and other aspects of the subscriber's information," like voicemail. *See id.* at 976–77. The regulatory rub with "enhanced service," as it is here with Internet access, is that it may be "offered via transmission wires" that, themselves, may constitute a "basic" or "telecommunications service." *See id.* at 977. Nevertheless, "given the fast-moving, competitive market" in which [enhanced services] were offered," the FCC did not subject them to common carrier regulation. *Id.*

Just so, when Congress exempted "information services" from common carrier regulation in 1996, it followed the FCC's longstanding course. *See id.* at 992 ("Congress passed the definitions in the Communications Act against the background of this regulatory history, and we may assume that the parallel terms 'telecommunications service' and 'information service' substantially incorporated their meaning, as the Commission has held."). The statute says "interactive computer service" includes "*any*" provider of "information service," and "*specifically* a service or system that provides access to the

Internet." *See* 47 U.S.C. § 230(f)(2) (emphasis added). The Act also *specifically excludes* "telecommunications services" from the definition of "Internet access service." *Id.* § 231(e)(4).

Unsurprisingly, the Act's definition of "information service" fits broadband Internet access like a glove. "[G]enerating, acquiring, storing," or "making available information via telecommunications" is what users do on social media websites like Facebook. *See id.* § 153(24). "[T]ransforming" or "utilizing" "information via telecommunications" is what users do on YouTube. *See id.* "[A]cquiring, storing," and "retrieving . . . information via telecommunications" is what users do with email. *See id.* The "offering of a capability" for engaging in all of these activities is exactly what is provided by broadband Internet access. *See id.*

## B.

### *Authority To Forbear Burdensome Regulations*

Before the 1996 Act, FCC sought to deregulate aspects of the telecommunications industry on its own authority. But, its assertions of inherent power to "forbear" common carrier regulations engendered judicial skepticism. *See, e.g.*, *MCI Telecomms. Corp. v. AT&T*, 512 U.S. 218, 234 (1994) ("[T]he Commission's desire to 'increase competition' cannot provide [it] authority to alter the well-established statutory filed rate requirements . . . . [S]uch considerations address themselves to Congress, not to the courts"); *AT&T v. FCC*, 978 F.2d 727, 736 (D.C. Cir. 1992) ("We understand fully why the Commission wants the flexibility to apply the tariff provisions of the Communications Act . . . . But the statute, as we have interpreted it, is not open to the Commission's construction. The Commission will have to obtain congressional sanction for

its desired policy course."). Heeding these admonitions, Congress gave FCC statutory authority to forbear common carrier regulations in the 1996 Act. *See* Telecommunications Act of 1996, Pub. L. No. 104-104 § 401, 110 Stat. 56, 128 (1996) (entitled "Regulatory Forbearance" and inserting this section into the Communications Act's Title I). Logically, forbearance is a tool for lessening common carrier regulation, not expanding it.

The authority to forbear regulation is limited to certain circumstances. FCC is only permitted to forbear when it has shown the common carriage provision is not needed: (1) to ensure just and reasonable prices and practices; or (2) to protect consumers. Forbearance must also be in the public interest. *See* 47 U.S.C. § 160(a).

## *C.*

### *Mobile Broadband Cannot Be Common Carriage*

The 1996 Act also ensured providers of mobile broadband Internet access "shall not . . . be treated as a common carrier *for any purpose*." *See* 47 U.S.C. § 332(c)(2) (emphasis added). Section 332 specifies only a commercial mobile service (or a "functional equivalent") can be subject to common carrier regulation. *Id.* §§ 332(c)(1)(A), (c)(2), (d)(3). "Private mobile service," in contrast, is "any mobile service" that is not a commercial one, and it may not be regulated as a common carrier. *See id.* § 332(d)(3). Section 332 defines "commercial mobile service" as a mobile service "provided for profit [that] makes interconnected service available [to the public]." *Id.* § 332(d)(1). The section then defines "interconnected service" as a "service that is interconnected with the public switched network (as such terms are defined by regulation by the [FCC])." *Id.* § 332(d)(2). The FCC—until the *Order* at issue

here—*always* defined "interconnected service" as "giv[ing] subscribers the capability to communicate . . . [with] *all* other users on the public switched network." *See* 47 C.F.R. § 20.3 (1994) (emphasis added). "[T]he public switched network" was, in turn, defined as the "common carrier switched network . . . that use[s] the North American Numbering Plan." *Id.* In other words, "the public switched network" is the telephone network. Though it is legislative history, the 1996 Act's Conference Report buttresses this textual reading. *See* H.R. Rep. No. 103-213, at 495 (1993) (characterizing the House version of Section 332 as interconnection with "the Public switched *telephone* network," even as both the House and Senate versions of Section 332 referred to "the public switched network") (emphasis added), *reprinted in* 1993 U.S.C.C.A.N. 1088, 1184. Moreover, § 332(d)(2) refers to one network: "*the* public switched network." In other words, the fact that another network can connect to the telephone network does not make that other network part of "the public switched network."

## II.

*FCC Practice Preserved The Free Market For Internet Access*

It is bizarre that the FCC is now disputing the notion that Congress would "attempt to settle the regulatory status of broadband Internet access services" with the 1996 Act. *See* Op. 34–35. Barely more than a year after the 1996 Act, Congress charged the FCC with assessing "the definitions of 'information service' . . . [and] 'telecommunications service'" in the Act, and "the application of those definitions to mixed or hybrid services . . . including with respect to Internet access." *See* Dep'ts of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1998, Pub. L. No. 105-119, § 623, 111 Stat. 2440, 2521 (1997). What is this but

8

inquiring into "the regulatory status" of Internet access in the 1996 Act and whether Congress was satisfied with its scheme?

The Commission's report, known as the *Universal Service Report*, made several conclusions confirming the text, history, and structure of the 1996 Act properly classified Internet access service as "information service." *See, e.g.*, Federal-State Joint Board on Universal Service, Report to Congress, FCC 98-67, 13 FCC Rcd. 11501, 11513–14 ¶ 27, 11536–40 ¶¶ 74–82 (1998) (hereinafter *Universal Service Report*). In this report, the FCC also endorsed the view of five Senators saying "[n]othing in the 1996 Act or its legislative history suggests [] Congress intended to alter the current classification of Internet and other information services or to expand traditional telephone regulation to new and advanced services." *Id.* at 11520 ¶¶ 38–39. As the Senators' view parallels the conclusions reached within the *Universal Service Report*, and their view is quite prescient, their letter is worth quoting at length:

> This unparalleled success [in Internet access] has emerged in the context of policies that favor market forces over government regulation— promoting the growth of innovative, cost- effective, and diverse quality services. *It is this same pro-competitive mandate that is at the heart of the 1996 Act. . . .* Simply put, Congress has not required the FCC to prepare and submit a Report on Universal Service that alters this successful and historic policy. *Moreover, were the FCC to reverse its prior conclusions and suddenly subject some or all information service providers to telephone regulation, it seriously would chill the growth and development of advanced sciences to the*

*detriment of our economic and educational well-being.*

Some have argued Congress intended that the FCC's implementing regulations be expanded to reclassify certain information service providers, specifically Internet Service Providers (ISPs), as telecommunications carriers. *Rather than expand regulation to new service providers, a critical goal of the 1996 Act was to diminish regulatory burdens as competition grew.* Significantly, this goal has been the springboard for sound telecommunications policy throughout the globe, and underscores U.S. leadership in this area. *The FCC should not act to alter this approach.*

Letter from Senators John Ashcroft, Wendell Ford, John Kerry, Spencer Abraham, and Ron Wyden to the Honorable William E. Kennard, Chairman, FCC (Received Mar. 23, 1998), http://apps.fcc.gov/ecfs/document/view?id=2038710001 (emphasis added).

The FCC heeded the *Universal Service Report*'s conclusions in subsequent Orders. In its *Advanced Services Order*, the FCC characterized the "last mile" of Digital Subscriber Line services (DSL services), or "broadband Internet service furnished over telephone lines," as a "telecommunications service." *See Verizon*, 740 F.3d at 630–31 (citing In re Deployment of Wireline Services Offering Advanced Telecommunications Capability, 13 FCC Rcd. 24012, 24014 ¶ 3, 24029–30 ¶¶ 35–36 (1998) ("*Advanced Services Order*")). But, the *Advanced Services Order* specified the last-mile *transmission* between the end user and the Internet

Service Provider is distinct from the "enhanced service" of Internet access itself. "The first service is a telecommunications service (e.g., the . . . transmission path), and the second service is an information service, in this case Internet access." *See Advanced Services Order* 24030 ¶ 36.

In 2002, the FCC issued its *Cable Broadband Order*. The Commission found that cable modem service "supports such functions as email, newsgroups, maintenance of the user's world wide web presence, and the DNS. Accordingly . . . cable modem service" is "an Internet access service," making it "an information service." *See* Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities; Internet Over Cable Declaratory Ruling; Appropriate Regulatory Treatment for Broadband Access to the Internet Over Cable Facilities, FCC 02-77, 17 FCC Rcd. 4798, 4822 ¶ 38 (2002) ("*Cable Broadband Order*"). This classification stood irrespective of the fact that "cable modem service provides the [enhanced service] capabilities described [] via 'telecommunications.'" *Id.* 4823 ¶ 39. In the case of cable modem service, "[t]he cable operator providing cable modem service over its own facilities . . . is not offering telecommunications service to the end user, but rather is merely using telecommunications to provide end users with cable modem service." *Id.* 4823–24 ¶ 41. The distinction between the services still stood, even as the nature of cable modem service rendered it an integrated "information service." This confirms, again, what is of relevance here: the fact that an "information service," like Internet access, has "telecommunications services" among its component parts does not *per se* make it a "telecommunications service." The *Cable Broadband Order* was at issue in *Brand X*.

*A.*

11

Brand X

In *Brand X*, the Supreme Court left the FCC's "information service" classification of cable-provided Internet access "unchallenged." *See* 545 U.S. at 987–88. *Brand X* also acknowledged, as FCC acknowledged in its prior Orders and in its briefing before the *Brand X* Court, "information service . . . [is] the analog to enhanced service" in the 1996 Act, and this "information service" includes accessing the Internet. *See* 545 U.S. at 987; *see also* FCC *Brand X* Reply Br. 5, No. 04-277 (Mar. 18, 2005) (explaining Internet access allows the user to "interact[] with stored data . . . maintained on the facilities of the other ISP (namely the contents of . . . web pages, e-mail boxes, etc.)"). When explaining why cable modem service was an "information service," the *Brand X* Court relied on cable modem service "provid[ing] consumers with a comprehensive capability for manipulating information using the Internet via high-speed telecommunications"—namely, "enabling users, for example, to browse the World Wide Web . . . . [to] match[] the Web page addresses that end users type into their browsers (or 'click' on) with the Internet Protocol (IP) addresses of the servers containing the Web pages the users wish to access." *Id.* at 987. Even as cable modem service relied on "telecommunications service" to bring this "information service" to the end user, "the nature of the functions the *end user* is offered" was Internet access, an information service—rendering the classification proper. *See id.* at 988 (emphasis added). The presumption here is, under the 1996 Act, Internet access is information service.

*Brand X* cannot be read to render broadband Internet access a "telecommunications service." As the Supreme Court said, "*the entire question* [in *Brand X*] is whether the products here are functionally integrated or functionally separate." *Id.* at 991 (emphasis added). In other words, does the fact that

cable modem service delivers the "information service" of Internet access through a "telecommunications service" render the two services one "offer" of "information service?" Or, is there one "offer" of "telecommunications service" in the transmission and one "offer" of "information service" in the Internet access? To channel Justice Scalia's *Brand X* pizzeria analogy, the *Brand X* majority found cable modem service a single "offer" of "information service," or a pizzeria's single "offer" of pizza and pizza delivery. Justice Scalia, in contrast, thought cable modem service contained "offers" of "telecommunications" *and* "information" services, respectively, or separate "offers" of "pizza delivery" and "pizza." *No* member of the *Brand X* Court disputed that what occurred at the Internet Service Providers' computer-processing facilities constituted an "information service." *See* 545 U.S. at 997–1000; *see also id.* at 1009–11 (Scalia, J., dissenting). Or, continuing the analogy, no member of the *Brand X* Court disputed that the pizzeria makes pizza. FCC would confirm that *nothing* in *Brand X* rendered Internet access itself a "telecommunications service." *See* Appropriate Framework for Broadband Access to the Internet Over Wireline Facilities, *et al*., FCC 05-150, 20 FCC Rcd. 14853, 14862 ¶ 12 (2005) ("Internet access service is an information service").

## B.

### *Reclassification and* Verizon

The FCC repeatedly affirmed the Act's deregulatory approach toward mobile broadband Internet access as well. In 2007, the Commission said "mobile wireless broadband Internet access service does not fit within the definition of 'commercial mobile service'" because it is not an "interconnected service"—it connects to the Internet and not

the telephone network. *See* Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks, FCC 07-30, 22 FCC Rcd. 5901, 5916 ¶ 41, 5917 (2007).[2] The FCC reached the same conclusion in 2011. *See* Reexamination of Roaming Obligations of Commercial Mobile Radio Service Providers and Other Providers of Mobile Data Services, FCC 11-52, 26 FCC Rcd. 5411, 5431 ¶ 41 (2011). In doing so, the Commission confirmed mobile broadband's status as outside common carrier classification.

This Court was equally consistent about the status of mobile broadband Internet service. In *Cellco Partnership v. FCC*, 700 F.3d 534 (D.C. Cir. 2012), this Court said Section 332 provides a "statutory exclusion of mobile-internet providers from common carrier status." *See id.* at 544. When the FCC attempted to treat mobile broadband like a common carrier in *Verizon*, this Court minced no words—the "treatment of mobile broadband providers as common carriers would violate section 332." 740 F.3d at 650.

To be sure, this Court said in *Verizon* that, under Section 706 of the 1996 Act, the FCC "never disclaimed authority to regulate the Internet or Internet providers altogether." *See id.* at 638. Whatever the wisdom of *Verizon*'s interpretation of Section 706, the FCC did not "reclassify broadband" to

---

[2] Importantly, one of the reasons the FCC saw no sense in classifying mobile broadband as "commercial mobile service" is the "internal contradiction within the statutory scheme" doing so would create with the status of Internet access as an information service. *See* 22 FCC Rcd. at 5916 ¶ 41 ("Concluding that mobile wireless broadband Internet access service . . . should not be . . . subject to . . . common carrier obligations . . . is most consistent with *Congressional intent to maintain a regime in which information service providers are not subject to Title II regulations as common carriers*.") (emphasis added).

implement "net neutrality" principles in that case. *See id.* at 633. In fact, as Judge Williams noted in dissent from the Court's Opinion here, "the *Verizon* court *struck down* the rules at issue on the ground that they imposed common carrier duties on the broadband carriers, impermissibly so" under the Act. *See* Concurring & Dissenting Op. 52 (emphasis in original); *see also Verizon*, 740 F.3d at 650 ("[R]egulating broadband providers as common carriers" would "obvious[ly] . . . violate the Communications Act."); *see also id.* at 656–59. Moreover, *Verizon* did not require the FCC to reclassify broadband in the future if the Commission wanted to implement any form of "net neutrality." Instead, *Verizon* identified FCC authority in Section 706 to implement some "net neutrality" regulations *without* reclassification (such as FCC's "transparency rules," which the *Verizon* Court upheld). When crafting this *Order*, the Commission took note of *Verizon*'s conclusions.

In announcing the *Order* here, the FCC Chairman claimed the *Order* "proposed" to "reinstate rules that achieve the goals of the 2010 Order using the Section 706-based roadmap laid out by the court [in *Verizon*]." *See* Notice of Proposed Rulemaking, FCC 14-61, 29 FCC Rcd. 5561, 5647 (2014) (statement of Chairman Tom Wheeler). No statement from the FCC—until after the President intervened, that is—ever suggested the Commission felt compelled by *Verizon* to reclassify broadband if it wanted to implement any "net neutrality" principles. Indeed, when the Notice of Proposed Rulemaking explained the contours of the *Order*'s ban on commercially unreasonable practices, it stated the following as FCC's goal: "*[C]odifying an enforceable rule to protect the open Internet that is not common carriage per se*." *See id.* at 5599, Subpart III.E (capitalizations omitted) (emphasis added). The Notice of Proposed Rulemaking made similar statements with respect to its revisions to the "no-blocking" rule after *Verizon*. *See id.* at 5595 ¶ 95.

*Verizon* found the FCC's proper Section 706 authority consistent with "the backdrop of the Commission's long [regulatory] history." *See* 740 F.3d at 638. That "backdrop" led *Verizon* to say: "Congress clearly contemplated that the Commission would continue regulating Internet providers in the manner it had previously." *Id.* at 639. Before the President's intervention in this *Order* and in light of *Verizon*, the Commission was going to do exactly that. But by reclassifying broadband Internet access as common carriage, "the circumstances" of this *Order* are "entirely different" from what *Verizon* considered. *See id.* at 638.

## III.

*The Order Here Lacks Congressional Authorization*

The *Order* at issue gives FCC the authority to regulate "all users of public IP addresses," or everything that connects to the Internet. *See* In the Matter of Protecting and Promoting the Open Internet ("*Order*") ¶ 396 (Feb. 26, 2015). By 2020, according to the FCC Chairman, this could amount to 50 billion interconnected devices. *See, e.g.*, Remarks of FCC Chairman Tom Wheeler, International Institute of Communications Annual Conference (Oct. 7, 2015), https://apps.fcc.gov/edocs_public/attachmatch/DOC-335877A1.pdf. This vast power comes from two different, but related statutory reclassifications. First, the FCC reclassifies fixed broadband Internet access from an "information service" under Title I of the Act to a "telecommunications service" under Title II. Second, the FCC reclassifies mobile broadband service as an "interconnected service" with "the public switched network" under Title III.

Both reclassifications ensure what the Court calls "consistent regulatory treatment" of mobile and fixed broadband Internet access. *See* Op. 77. By "consistent regulatory treatment," the Court means the FCC can treat Internet access like monopolist railroads and telephone services—as a common carrier subject to public utility regulation. The innovation of modern technology now falls prey to the regulatory labyrinth smothering the old.

Subjecting all broadband Internet access to common carrier regulation lets FCC decide how to apply onerous requirements on Internet access. This authority covers all the ways in which Internet Service Providers conduct and run their respective businesses. The *Order* gives the FCC authority to determine, case-by-case, whether any activities "unreasonably interfere with or unreasonably disadvantage the ability of consumers to reach the Internet content, services, and applications of their choosing." *Order* ¶ 135. FCC is empowered to assess the "reasonableness" of all rates, terms, and practices of Internet Service Providers. *See, e.g.*, *id.* ¶¶ 441–52, 512, 522. The *Order* also includes an outright ban on several practices, including: "throttling," or slowing Internet service down, *id.* ¶ 119; blocking access to certain Internet content; and on individualized negotiation of Internet access between content owners and Internet Service Providers (called "paid prioritization"), *id.* ¶ 125. Some practices are explicitly left for the FCC to address in the future, like not charging end customers for the data used by certain applications or Internet services ("zero rating"), and sponsored-data plans, *id.* ¶¶ 151–53. In short, the *Order* establishes the FCC's long-term authority over Internet access.

The FCC's unheralded assertion of power has already led some smaller Internet Service Providers to "cut[] back on investments [in broadband Internet access]." *See* Statement of

FCC Commissioner Ajit Pai On New Evidence That President Obama's Plan To Regulate The Internet Harms Small Businesses And Rural Broadband Deployment (May 7, 2015), http://go.usa.gov/3wAkn. I doubt they will be the last Providers to lessen their investments in Internet access, or to attempt navigating their business practices around FCC regulation. The Court's Opinion is blasé about grafting public utility regulation on to an innovative enterprise. *See* Op. 97. But, the conceit of regulatory capture is often fatal to growth, leading regulation to fail at its own aims by operating on only a pretense of knowledge. *See* F.A. Hayek, THE FATAL CONCEIT: THE ERRORS OF SOCIALISM 76 (W.W. Bartley, III ed. 1991) ("The curious task of economics is to demonstrate to men how little they really know about what they imagine they can design.").

Reclassifying broadband Internet access so as to subject it to common carrier regulation upends the Act's core distinction between "information service" and "telecommunications service," and it rewrites the statutory prohibition on treating mobile broadband providers as common carriers. Distinguishing "enhanced service," like Internet access, from "basic services" subjected to public utility regulation is not some trivial matter, nor is it resolved simply by whether Congress authorized FCC to have *some* degree of regulatory authority over the Internet. Drawing this distinction is "the essential characteristic" of the 1996 Act. *Cf. MCI Telecomms. Corp.*, 512 U.S. at 231. "What we have here, in reality, is a fundamental revision of the statute, changing it from a scheme of" common carrier regulation for telecommunications services, to common carrier regulation of information service when that service merely has telecommunications services among its component parts. *Cf. id.* "That may be a good idea, but it was not the idea Congress enacted into law in 19[96]." *See id.* at 232. Therein lies the problem.

*A.*

*The Major Question Of Reclassification Requires Clear Congressional Authority*

One might be tempted to say turning Internet access into a public utility is obviously a "major question" of deep economic and political significance—any other conclusion would fail the straight-face test. But, the Court exhibits no such qualms. *See* Op. 37–38. Of course, the Opinion does not—and cannot—dispute the FCC's *Order* implicates a "major question." Indeed, the Court has already characterized "net neutrality" regulation as a "major question," even without the distinct salience brought by implementing "net neutrality" through reclassifying broadband Internet access. *See Verizon*, 740 F.3d at 634 ("Before beginning our analysis, we think it important to emphasize that . . . the question of net neutrality implicates serious policy questions, which have engaged lawmakers, regulators, businesses, and other members of the public for years . . . . Regardless of how serious the problem an administrative agency seeks to address, . . . it may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law."). The problem here is the Court's analysis—it ignores the legal consequences flowing from the "major question" determination.

As Chief Justice John Marshall recognized long ago, there is a difference between "those important subjects, which must be entirely regulated by the legislature itself, from those of less interest, in which a general provision may be made, and power given to those who are to act under such general provisions to fill up the details." *See Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43 (1825). Accordingly, the deference courts afford

to administrative agencies under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) is "premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000) (citing *Chevron*, 467 U.S. at 844); *see also La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) (holding the FCC has "literally . . . no power to act . . . unless and until Congress confers power upon it"). In other words, the mere existence of "a statutory ambiguity," *see* Op. 38, "is not enough *per se* to warrant deference to the agency's interpretation. The ambiguity must be such as to make it appear that Congress either explicitly or implicitly delegated authority to cure that ambiguity." *Am. Bar Ass'n v. Fed. Trade Comm'n*, 430 F.3d 457, 469 (D.C. Cir. 2005); *see also Brown & Williamson*, 529 U.S. at 133 (requiring an agency to bear in mind "the fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme").

An agency's freedom to regulate on a matter via a statutory ambiguity therefore turns on what Congress authorized—and that latter determination is "shaped, at least in some measure, by the nature of the question presented." *See id.* at 125; *see also Am. Bar Ass'n*, 430 F.3d at 469. Is the agency regulating on a "major question" of deep economic and political significance, or is it regulating on an interstitial matter? If Congress is not going to leave "those important subjects" to "itself," but instead authorize an agency to regulate on them, an implicit authorization is insufficient. "We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *Util. Air Regulatory Group v. EPA*, 134 S. Ct. 2427, 2444 (2014) (*UARG*); *King v. Burwell*, 135 S. Ct. 2480, 2488–89 (2015) ("[H]ad Congress wished to assign that [extraordinary] question to an agency, it

surely would have done so expressly;" requiring the Court to interpret the statute *de novo* for a clear statement of congressional authorization); *Brown & Williamson*, 529 U.S. at 160 (authorizing an agency to regulate on a matter of "such economic and political significance" would not occur "in so cryptic a fashion"); *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."); *MCI Telecomms. Corp.*, 512 U.S. at 231 ("It is highly unlikely that Congress would leave the determination of whether an industry will be entirely, or even substantially, rate-regulated to agency discretion—and even more unlikely that it would achieve that through such a subtle device as permission to 'modify' rate-filing requirements.").

The Court fails to fairly engage this standard of review, both overrating the role of the statutory ambiguity here and underrating the application of the clear statement rule to major questions.[3] After jumping right into *Chevron*'s two-step deference analysis, the Court's Opinion treats *Brand X* as the

---

[3] Unfortunately, cavalier treatment of the clear statement requirement for major questions is not unprecedented. When *Verizon* admitted "net neutrality" implicated a major question, it quoted *Brown & Williamson*'s standard of review (though, perhaps to avoid facing the clear statement rule head on, *Verizon* chose to quote a case quoting *Brown & Williamson*, not *Brown & Williamson* itself). *Compare Verizon*, 740 F.3d at 634 ("Regardless of how serious the problem an administrative agency seeks to address, . . . it may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law.") *with Brown & Williamson*, 529 U.S. at 125. But then, *Verizon* did *not* apply the clear statement analysis, *see* 740 F.3d at 634, concluding instead that the case "is a far cry" from *Brown & Williamson*, despite its supporting quotation. *See id.* at 638.

*coup de grace* for any requirement of clear congressional authorization. *See* Op. 32–38. Yes, *Brand X* did uphold the FCC's determination that the "offering" of "telecommunications service" in Title II of the Communications Act is ambiguous. *See* 545 U.S. at 986, 989. But this "statutory ambiguity" does not allow the FCC to reclassify broadband Internet access without any serious judicial scrutiny. *But see* Op. 38.

The mere fact that a "statutory ambiguity" exists for some purposes does not mean it authorizes the agency to reach major questions—statutory context and the overall scheme must be considered. *See, e.g.*, *UARG*, 134 S. Ct. at 2441 ("[W]hile *Massachusetts* rejected EPA's categorical contention that greenhouse gases *could not* be 'air pollutants' for any purposes of the Act, it did not embrace EPA's current, equally categorical position that greenhouse gases *must* be air pollutants for all purposes, regardless of the statutory context.") (emphasis in original); *Whitman*, 531 U.S. at 469 n.1 ("None of the sections of the CAA in which the District of Columbia Circuit has found authority for the EPA to consider costs shares § 109(b)(1)'s prominence in the overall statutory scheme."). When the statutory context and backdrop against which Congress passed the 1996 Act are considered, as they were in *Brand X*, the Supreme Court's decision reinforces the need for FCC to show a textual assignment of authority before it can reclassify broadband Internet access as common carriage.

The *Order* posits—and the Court's Opinion approves—an untenable reading of *Brand X*: the pizzeria no longer offers "pizza" or "pizza delivery," it just offers "delivery." In other words, because the "information service" of retrieving information from Internet websites includes "telecommunications service," every aspect of that "information service" is now just a "telecommunications

service." *See, e.g.*, *Order* ¶ 195. The Court tries to wave off this problem by quickly saying *Brand X* "focused on the nature of the functions broadband providers offered to end users, not the length of the transmission pathway" Op. 33. This is true, but it does nothing to support the Court's position. As the history explained above reveals, "the nature of the functions broadband providers offered to end users" was the focus of *Brand X* because the Supreme Court did not challenge the fact that "enabl[ing] users . . . to browse the World Wide Web" is information service. *See* 545 U.S. at 987. In response, the Court's Opinion resorts to crying wolf—claiming a full reading of *Brand X* would "freeze in place the Commission's existing classifications of various services," which neither Congress nor *Brand X* intended. *See* Op. 35. But this misses the point. Yes, *Brand X* found the "offering" of "telecommunications service" ambiguous. And yes, *Brand X* allows FCC to assess the "factual particulars" of changed broadband technology. *See* 545 U.S. at 991. But, nothing in *Brand X* renders the *statutory* term "information service" indistinguishable from "telecommunications service." Computer processing at ISP facilities remains an "enhanced service" exempt from common carrier status under the statute. *See* 47 U.S.C. §§ 230(f)(2), 231(e)(4).

By incorporating FCC's distinction between "enhanced service" and "basic service" into the statutory scheme, and by placing Internet access on the "enhanced service" side, Congress prohibited the FCC from construing the "offering" of "telecommunications service" *to be* the "information service" of Internet access. *See Universal Service Report* ¶ 39 ("After careful consideration of the statutory language and legislative history, we affirm our prior findings that telecommunications service and information service in the 1996 Act are *mutually exclusive*.") (emphasis added); *see also Sekhar v. United States*, 133 S. Ct. 2720, 2724 (2013) ("[I]f a word is obviously

transplanted from another legal source . . . it brings the old soil with it."); *see also Brown v. Gardner*, 513 U.S. 115, 118 (1994) ("Ambiguity is a creature not of definitional possibilities but of statutory context."); *cf. Brown & Williamson*, 529 U.S. at 144 ("In adopting each statute, Congress has acted against the backdrop of FDA's consistent and repeated statements that it lacked authority under the FDCA to regulate tobacco . . . ."). The issue therefore, is *not* whether FCC can assess technological changes to Internet access, or whether FCC has discretion to reasonably construe the "offer" of "telecommunications service" by considering that transmission part of the "information service" it transmits, or considering the transmission itself an "offer" of "telecommunications service" separate from the "information service" it transmits. Rather, the issue is whether FCC can use this discretion to transgress congressional distinctions and definitions—such as the distinction drawn between "Internet access service" and "telecommunications services," *see* 47 U.S.C. § 231(e)(4), or the definition of "interactive computer services," which "means any information service . . . *including specifically a service or system that provides access to the Internet*," *id.* § 230(f)(2) (emphasis added). Nothing, not even *Chevron* deference, makes "a statutory ambiguity," *see* Op. 38, a tool to override congressional standards.

Congress has declined to authorize "net neutrality" legislation of any kind, let alone revisit its classification of Internet access as outside the realm of common carrier regulation. The FCC's historic practice, taken together with Congress's refusal to cede this authority, obligates us "to defer not to the agency's expansive construction of the statute, but to Congress'[s] consistent judgment." *See Brown & Williamson*, 529 U.S. at 160.

*B.*

24

*No Clear Congressional Authority To Reclassify*

"Since an agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning that the statute can bear, the Commission's . . . policy can be justified only if it makes a less than radical or fundamental change in the Act . . . . The Commission's attempt to establish that no more than that is involved greatly understates the extent to which its policy deviates from the [Act's] requirement[s], and greatly undervalues the importance of the [Act's] requirement[s]." *MCI Telecomms. Corp.*, 512 U.S. at 229; *see also UARG*, 134 S. Ct. at 2442 ("Thus, an agency interpretation that is inconsisten[t] with the design and structure of the statute as a whole . . . does not merit deference.").

Perhaps this explains why the Court's Opinion foregoes a statutory analysis. On issue after issue, the Court puts agency *ipse dixit* where reasoned analysis should be:

*First*, as to the 1996 Act's policy statements, the Court simply parrots the Commission's speculation that it is "unlikely [] Congress would attempt to settle the regulatory status of broadband Internet access services in such an oblique and indirect manner, especially given the opportunity to do so when it adopted the Telecommunications Act of 1996." *See* Op. 34–35. But the clear statement rule requires reading the statute, not nodding along with the agency. Broadband Internet access may be more sophisticated than Internet access from the 1990s, but this does not change the *nature* of broadband Internet access. *Cf. Brand X*, 545 U.S. at 992 ("In any event, we doubt that a statute that, for example, subjected offerors of 'delivery' service (such as Federal Express and United Parcel Service) to common-carrier regulation would unambiguously require pizza-delivery companies to offer their delivery services on a

common carrier basis [too].").[4] The Act's policy statements are fulfilled in specific statutory provisions, but the Court's Opinion ignores them.

*Second*, the Court's Opinion makes mincemeat of *Verizon* and sends the *Universal Service Report* silently into the night. The *Order* here claims the *Universal Service Report* was "not a binding Commission order." *Order* ¶ 315. This is as inexplicable as it is unexplained. The *Order* provides no principled reason why the *Universal Service Report*—a report of FCC Commissioners to Congress—should be dismissed, nor why the FCC's repeated citation to the *Universal Service Report* in prior Orders should be ignored. The Court is silent on this issue, and its assessment of *Verizon* is revisionist history. It claims FCC "did not believe" *Verizon* left it with any choice but to reclassify broadband Internet access as a "telecommunications service" if it wished to implement "net neutrality" principles. *See* Op. 43. But as *Verizon*'s upholding of FCC's transparency rules, the statements from FCC Chairman Wheeler, and this *Order*'s Notice of Proposed Rulemaking together confirm, this is false. The FCC identified a path to implement some "net neutrality" regulation without reclassification. The Court just ignores it.

---

[4] Nor, incidentally, does the Act's exclusion from "information service" those services that are "the management, control, or operation of a telecommunications system or the management of a telecommunications [purpose]" provide the Court or the Commission any assistance. *See* 47 U.S.C. § 153(24). A contrary conclusion would mean that Congress in 1996 considered Internet access, and all its computer-processing functions, a "basic service," able to be provided by the Bell System companies. There is no evidence of that in the Act, FCC's longstanding practice, or in *Brand X*.

26

*Third*, the Court nonsensically permits mobile broadband's reclassification by embracing the *Order*'s redefinition of "the public switched network." The Court's Opinion, like the *Order*, redefines "the public switched network" to "encompass devices using both IP addresses and telephone numbers." *See* Op. 66. Since mobile broadband Internet access allows users to access Voice-over-Internet-Protocol ("VoIP") applications (such as Skype), the Court concludes mobile broadband "gives subscribers the capability to communicate to telephone users." *See id.* at 67. But the backdrop against which Congress enacted the 1996 Act confirms the FCC *never* defined "the public switched network" to mean anything other or beyond the telephone network, and certainly not public IP addresses.[5] Indeed, Congress itself distinguished "the public switched network" and the Internet. When Congress passed the Spectrum Act of 2012, it distinguished "connectivity" to "the public Internet" from "connectivity" to "the public switched network." *See* 47 U.S.C. § 1422(b)(1). This subsequent, specific distinction can

---

[5] Time and again leading up to the Telecommunications Act of 1996, the FCC equated "the public switched network" with the telephone network. This was the case in 1981. *See Applications of Winter Park Tel. Co.*, Mem. Op. and Order, 84 FCC 2d 689, 690 ¶ 2 n.3 (1981). This Court said the same in 1982. *See Ad Hoc Telecomms. Users Comm. v. FCC*, 680 F.2d 790, 793 (D.C. Cir. 1982). This equation provided a key premise to the FCC's cell service policy in 1992. *See* Amendment of Part 22 of the Commission's Rules Relating to License Renewals in the Domestic Public Cellular Radio Telecommunications Service, FCC 91-400, 7 FCC Rcd. 719, 720 ¶ 9 (1992). Indeed, the calls to expand "the public switched network" to include the "network of networks," cited in the current *Order*, *were rejected by FCC in 1994*. *Compare* Implementation of Sections 3(n) and 332 of the Communications Act; Regulatory Treatment of Mobile Services, FCC 94-31, 9 FCC Rcd. 1411, 1433–34 ¶ 53, 1436–37 ¶ 59 (1994) *with Order* ¶ 396 n. 1145.

inform what "the public switched network" meant to Congress in 1996. *See Brown & Williamson*, 529 U.S. at 133 ("[T]he meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand."). The Court has no basis to claim it is "counter-textual" to equate "the public switched network" with "the public switched telephone network." *See* Op. 65 (emphasis omitted). Not even the Court can claim VoIP services make mobile broadband and the telephone network a single network. *See id.* at 67 ("[T]he VoIP service sends the call from her tablet's IP address *over the mobile broadband network to connect to the telephone network* and, ultimately, to her friend's home phone.") (emphasis added). Nothing about the increase of consumers accessing mobile broadband Internet service via smart phones, *see id.* at 68–69, the speed of Internet connection, *id.* at 69, or the "bundling" of VoIP applications with smart phones, *id.* at 69–70, undermines the FCC's 2007 distinction between the *transmission* of VoIP traffic and the VoIP *service* to the end user. Mobile broadband Internet access simply does not constitute a service interconnected with "*the public switched network.*"

*Fourth*, the Court lets FCC get away with satisfying *none* of the statutory requirements to forbear common carriage regulation. The judiciary should take care to ensure the Commission rigorously applies these standards in accordance with the 1996 Act's overall scheme. Even as forbearance is designed to further freedom in the 1996 Act, giving an agency power to eviscerate statutory requirements is "astonishing even by administrative standards." *See* Phillip Hamburger, IS ADMINISTRATIVE LAW UNLAWFUL? 121 (2014). Under our Constitution, "[t]here is no provision . . . that authorizes the President [or any executive agency] to enact, to amend, or to

repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).[6]

"[T]he power to enact statutes may only be exercised in accord with a single, finely wrought and exhaustively considered, procedure." *Id.* at 439–440. This power is intrinsically legislative; it cannot be delegated away from the legislature. When Congress has delegated authority allowing the "suspension" or "repeal" of statutory provisions, "*Congress itself made the decision to suspend or repeal the particular*

---

[6] The FCC's rulemaking here may "take [a] 'legislative' . . . form[], but [it] [is] [an] exercise[] of—indeed under our constitutional structure [it] *must be* [an] exercise[] of—the 'executive Power.'" *See City of Arlington v. FCC*, 133 S. Ct. 1863, 1873 n.4 (2013) (emphasis in original); *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 524–25 (2009) ("In [Justice Stevens'] judgment, the FCC is better viewed as an agent of Congress than as part of the Executive. . . . *Leaving aside the unconstitutionality of a scheme giving the power to enforce laws to agents of Congress*, it seems to us that Justice [Stevens'] conclusion does not follow from his premise.") (emphasis added); *see also* 47 U.S.C. § 151 (creating the FCC to "execute and enforce the provisions of this [Act]"). Moreover, there is an argument that, though a nominally independent agency, the FCC, as a general matter, should be treated like an executive agency because Congress never created a for-cause removal statute prohibiting "the President [from] supervis[ing], direct[ing], and remov[ing] at will the" FCC Commissioners. *See PHH Corp. v. Consumer Fin. Prot. Bureau*, 839 F.3d 1, 18 n.4 (D.C. Cir. 2016). "We need not tackle that question in this case," however, *id.*, because the rulemaking exercised here facilitates a change in the execution and enforcement of the Act— this must be executive Power, *see City of Arlington*, 133 S. Ct. at 1873 n.4; *Fox TV Stations*, 556 U.S. at 525 ("The Administrative Procedure Act, after all, does not apply to Congress and its agencies," only to executive agency action).

*provisions at issue upon the occurrence of particular events subsequent to enactment, and it left only the determination of whether such events occurred up to the President," or in this case, the FCC. See id.* at 445 (emphasis added). In other words, only Congress may alter statutory standards—an agency or the President is left simply to make factual findings about whether those legal standards should apply.

Yet, as Judge Williams noted in his opinion here, "the Commission's massive forbearance [came] without findings that the forbearance is justified" under the statute's conditions. *See* Concurring & Dissenting Op. 62; *see also id.* at 62–69. Both the FCC and the Court found reclassifying Internet access as a "telecommunications service," coupled with forbearance, would be within FCC's power *even without a change in the underlying factual circumstances of Internet access. See Order* ¶ 360 n.993; Op. 47. In other words, the Court concludes the FCC's forbearance need not have anything to do with factual findings—the Commission is free to rewrite statutory terms as it sees fit. Used in this way, forbearance usurps the exclusively-legislative function of lawmaking because, "[i]n both legal and practical effect, the [FCC] has amended [an] Act[] of Congress by repealing [or amending] a portion." *See Clinton*, 524 U.S. at 438; *see also UARG*, 134 S. Ct. at 2446 n.8 (I am "aware of no principle of administrative law that would allow an agency to rewrite such [] clear statutory term[s], and [I] shudder to contemplate the effect that such a principle w[ill] have on democratic governance").

Troubling as the failure to follow the Act's requirements is, that is not the FCC's only abuse. It also used forbearance to pervert the Act's requirements.

*C.*

*Perversion Of Forbearance Authority*

FCC's use of its forbearance authority confirms this *Order* is "an enormous and transformative expansion [of its] regulatory authority without clear congressional authorization" and, thus, "unreasonable." *UARG*, 134 S. Ct. at 2444 n.8. By the FCC Chairman's own admission, the Act's common carrier regulations do not contemplate broadband Internet access. So, the *Order* cannot merely reclassify broadband Internet access, it must also "modernize Title II, tailoring it for the 21st century." Tom Wheeler, *FCC Chairman Tom Wheeler: This is How We Will Ensure Net Neutrality*, WIRED (Feb. 4, 2015, 11:00 AM), https://www.wired.com/2015/02/fcc-chairman-wheeler-net-neutrality/. As the Chairman conceded, this required "taking the legal construct that once was used for phone companies and pairing it back to modernize it." *FCC Proposes Treating All Internet Traffic Equally*, PBS NEWSHOUR (PBS television broadcast Feb. 4, 2015, 6:35 PM), http://www.pbs.org/newshour/bb/fcc-proposes-treating-all-internet-traffic-equally.

The *Order* acknowledges its tailoring of the Act's common carrier requirements so as to capture broadband Internet access is "extensive," "broad," "[a]typical," and "expansive"—including at least 30 Title II provisions and 700 rules promulgated under them. *See Order* ¶¶ 37, 51, 438, 461, 493, 508, 512, 514. The *Order* also says this level of forbearance results in a modernization of Title II "never" before contemplated. *See id.* ¶¶ 37, 38. The Court's Opinion and the *Order* disregard the nature of forbearance.

Forbearance permits the FCC *to reduce* common carriage regulation over telecommunications, *not expand* common carriage regulation by reclassifying an information service and shaping common carriage regulations around it. The FCC has

consistently understood this, invoking forbearance toward one of "Congress's primary aims in the 1996 Act:" "deregulate telecommunications markets to the extent possible." *See, e.g.*, Memorandum Op. & Order, Petition of Qwest Corp. for Forbearance Pursuant to 47 U.S.C. § 160(c) in the Omaha Metro. Statistical Area, 20 FCC Rcd. 19415, 19454 (2005); *see also* Petition of ACS of Anchorage, Inc. Pursuant to Section 10 of the Commc'ns Act of 1934, as Amended, for Forbearance from Sections 251(c)(3) & 252(d)(1) in the Anchorage Study Area, 22 FCC Rcd. 1958, 1969 ¶ 16 (2007) (referring to the "deregulatory aims" of FCC's statutory forbearance authority). The Court, however, makes an argument foreign to the 1996 Act. The Opinion claims "the rapid deployment of new telecommunications technologies" "might occasion the promulgation of additional regulation." Op. 97. Congress, however, clearly did not consider the 1996 Act's goals— promoting competition and reducing regulation—in tension with "the rapid deployment of new telecommunications technologies." Rather, the Act's obvious reading is that more competition and lower regulation would lead to increased deployment of new telecommunications technologies. The ensuing history of Internet innovation vindicated Congress's policy choice. Understanding the expansion of common carrier regulation as an affirmative good, as the Court seems to do, is foreign to the Act.

There is a sad irony here. Both this Court and the Supreme Court admonished the FCC for asserting forbearance authority without congressional authorization when the Commission's aim was *deregulatory*. Now, when the Commission's aim is to *increase regulation*, this Court is willing to bless the Commission using forbearance without any satisfaction of the statutory requirements, and at odds with the nature of forbearance itself.

*UARG* cited generally-applicable tenets of administrative law and the separation of powers—not some Clean Air Act novelty—when it said "[a]n agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms." 134 S. Ct. at 2445. The Court blithely ignores its "severe blow to the Constitution's separation of powers" by reading the FCC's forbearance authority to expand, rather than lessen, common carrier regulation at the legislature's expense. *See id.* at 2446. The Court provides no answer to the problems of public accountability and individual liberty with its mere assertion of forbearance being a "statutory mandate." *Compare* Op. 41 *with Clinton*, 524 U.S. at 451–52 (Kennedy, J., concurring). If the FCC is to possess statutory forbearance authority, it should conform to forbearance's statutory conditions and the overall statutory scheme. Neither is the case here. The FCC's abuse of forbearance amounts to rewriting the 1996 Act in the bowels of the administrative state, when it should petition Congress for these purportedly-necessary changes.

**IV.**

*Presidential Interference*

When all the statutory somersaults, revisionist history, and judicial abdication are done, we are still left with a lingering question: *Why*, on the verge of announcing a new *Open Internet Order* in 2014 that both implemented "net neutrality" principles and preserved broadband Internet access as an "information service," would the FCC instead reclassify broadband Internet access as a public utility? Simple. President Obama pressured the FCC to do it. This Court once held "an agency may not repudiate precedent simply to conform with a shifting political mood." *Nat'l Black Media*

*Coal. v. FCC*, 775 F.2d 342, 356 n.17 (D.C. Cir. 1985). Alas, here we see the exception that kills the rule.

The FCC released its Notice of Proposed Rulemaking in May of 2014—where it was clear that broadband Internet would not be reclassified for common carrier regulation. Afterward, "an unusual, secretive effort" began "inside the White House" with activists interested in getting the FCC to change its position. *See* G. Nagesh & B. Mullins, *Net Neutrality: How White House Thwarted FCC Chief*, WALL ST. J. (Feb. 4, 2015). White House staffers were directed "not to discuss the process openly." *Id.* One can see why—the FCC is, after all, supposed to be independent from Presidential control. *See, e.g.*, *Humphrey's Ex'r v. United States*, 295 U.S. 602, 624–26 (1935).

In addition to the White House's private meetings, the President issued an online video (from China, without any irony) urging the subjugation of broadband Internet access to common carrier regulation. *See* G. Nagesh & B. Mullins, *Net Neutrality: How White House Thwarted FCC Chief*, WALL ST. J. (Feb. 4, 2015); *see also The President's Message On Net Neutrality* (Nov. 10, 2014), https://www.whitehouse.gov/net-neutrality ("To put these protections in place, I am asking the FCC to reclassify Internet service under Title II of a law known as the Telecommunications Act."). In the President's written statement, he said this reclassification should be facilitated by "at the same time forbearing from rate regulation and other provisions less relevant to broadband services." *Id.*

The President's statements "stunned officials at the FCC;" "the statement[s] boxed in [the FCC Chairman] by giving the FCC's two other Democratic commissioners cover to vote against anything falling short of [the President's] position." G. Nagesh & B. Mullins, *Net Neutrality: How White House*

*Thwarted FCC Chief*, WALL ST. J. (Feb. 4, 2015). Moreover, President Obama's statements were issued "outside of the window that the FCC had set for public comments," but the FCC accepted them anyway. *See* Kathryn A. Watts, *Controlling Presidential Control*, 114 MICH. L. REV. 683, 741 (2016); *see also The Path To A Free And Open Internet*, https://www.whitehouse.gov/net-neutrality (identifying in a timeline that "[t]he FCC's comment period c[ame] to a close" on September 15, 2014, but "President Obama call[ed] on the FCC to take up the strongest possible rules to protect net neutrality" on November 10, 2014).

The President's efforts "essentially killed the compromise" of "net neutrality" without reclassification. G. Nagesh & B. Mullins, *Net Neutrality: How White House Thwarted FCC Chief*, WALL ST. J. (Feb. 4, 2015). The FCC Chairman promptly delayed release of the new *Order* to consider the President's position. *See FCC Chairman Tom Wheeler's Statement on President Barack Obama's Statement Regarding Open Internet* (Nov. 10, 2014), https://apps.fcc.gov/edocs_public/attachmatch/DOC-330414A1.pdf. "On February 26, 2015, the FCC voted 3-2 along party lines to regulate broadband Internet service as a public utility under Title II of the Communications Act, thus voting for net neutrality rules aligned with [President] Obama's own plan." Watts, *Controlling Presidential Control*, 114 MICH. L. REV. at 741.

There is a wide spectrum of agreement that the President's intervention into the FCC's deliberations was, with respect to broadband's reclassification, outcome determinative. This spectrum includes a former Special Assistant to President Obama and current "net neutrality" advocate. *See* Susan Crawford, *A Tale of Two Commissioners*, BACKCHANNEL (May 26, 2015), https://backchannel.com/how-the-fcc-found-

its-backbone-960331bfac95#.s1rj231ui ("[T]he FCC, although an independent agency, can read the President's speeches like everyone else, sense the change in the wind, and act accordingly."). It includes a dissenting FCC Commissioner. *See Order* (dissenting statement of Commissioner Ajit Pai) ("So why is the FCC changing course? Why is the FCC turning its back on Internet freedom? Is it because we now have evidence that the Internet is not open? No. Is it because we have discovered some problem with our prior interpretation of the law? No. We are flip-flopping for one reason and one reason alone. President Obama told us to do so."). It includes a Report from the Majority Staff of the Senate Committee on Homeland Security and Governmental Affairs, which investigated the White House's involvement in the FCC's deliberations. *See* Majority Staff Report, Committee on Homeland Security and Governmental Affairs (Ron Johnson, Chairman), *Regulating The Internet: How The White House Bowled Over FCC Independence*, *2 (Feb. 29, 2016) http://www.hsgac.senate.gov/download/regulating-the-internet-how-the-white-house-bowled-over-fcc-independence (citing internal FCC correspondence to conclude, the "influence [of President Obama] was disproportionate relative to the comments of members of the public," and that his involvement created a "pause" within the FCC's deliberations so to build a legal argument for reclassification). It also includes law professors ultimately sympathetic with the President's intervention. *See, e.g.*, Watts, *Controlling Presidential Control*, 114 MICH. L. REV. at 719 ("Pai is clearly correct that President Obama played a key causal role in the FCC's shift in its approach and ultimate decision to reclassify broadband.").

Despite President Obama's "key causal role" behind the FCC's reclassification flip, his involvement goes virtually unmentioned in the *Order*. In the course of the *Order*'s

hundreds of pages and more than a thousand footnotes, there is *one, indirect*, reference to President Obama's advocacy, buried in the middle of a footnote. *See Order* ¶ 416 n. 1223 (quoting a letter asking whether "the President's push for Title II reclassification would affect" a company's broadband investments). Despite the FCC's dearth of reference to the President's involvement, two footnotes within the *Order* contain citations to sources characterizing the approach the FCC would ultimately take toward "net neutrality" as President Obama's "plan." *See Order* ¶ 40 n. 35, ¶ 416 n. 1220.

The President's conduct—and the involvement of White House staff more generally—raise questions about the form and substance of executive Power. Unfortunately, none of these questions were addressed by the Court. Given the salience of these questions to our Constitution's separation of powers, this Court owed the American people a legal analysis, not silent obedience.

*A.*

*A Double Standard*

The questions of form raised by the President's involvement concern the rulemaking procedures designed to ensure public accountability—namely, the FCC's regulations on *ex parte* communications and adherence to notice and comment requirements. To be sure, rulemaking is not a "rarified technocratic process, unaffected by political considerations or the presence of Presidential power." *Sierra Club v. Costle*, 657 F.2d 298, 408 (D.C. Cir. 1981). And, as we have held, "the need for disclosing *ex parte* conversations in some settings do[es] not require that courts know the details of every White House contact . . . ." *See id.* at 407. The FCC,

however, has its own rules regarding *ex parte* contacts, and the White House would be aware of them.

The *Order*'s Notice of Proposed Rulemaking referred to and detailed some of the FCC's *ex parte* requirements. *See* Notice of Proposed Rulemaking 5624–25 ¶ 181 (citing, *inter alia*, FCC's *ex parte* rules, at 47 C.F.R. §§ 1.1200 *et seq*.). FCC Chairman Wheeler said the Commission would "incorporate the President's submission into the record of the Open Internet Proceeding," *FCC Chairman Tom Wheeler's Statement on President Barack Obama's Statement Regarding Open Internet* (Nov. 10, 2014), https://apps.fcc.gov/edocs_public/attachmatch/DOC-330414A1.pdf. But, neither the Chairman's statement nor the *Order* explain why the President was allowed to make his submission *after* the comment period expired. S*ee* Watts, *Controlling Presidential Control*, 114 MICH. L. REV. at 741. Nor does the Commission ever explain why further public comment was not solicited after the President intervened— despite the Chairman stating he welcomed further comment. The *Order*'s record does not establish whether the communications between White House staffers and the FCC satisfied the Commission's regulations on *ex parte* communications (or why these communications were exempt from these rules). *See* Majority Staff Report, Committee on Homeland Security and Governmental Affairs (Ron Johnson, Chairman), *Regulating The Internet: How The White House Bowled Over FCC Independence*, *25 (Feb. 29, 2016) http://www.hsgac.senate.gov/download/regulating-the-internet-how-the-white-house-bowled-over-fcc-independence ("The documents reviewed by the Committee make clear that Chairman Wheeler regularly communicated with presidential advisors. None of the communications reviewed by the Committee were submitted to the FCC's formal record in the form of *ex parte* notices although the [*Open Internet*] *Order*

was clearly discussed."). The White House had reason to know of its obligations under the FCC's *ex parte* rules. *See, e.g.*, Memorandum from Deputy Assistant Attorney Gen. John O. McGinnis to the Deputy Counsel to President George H. W. Bush, 15 Op. O.L.C. 1, 1 (Jan. 14, 1991) (assessing the propriety of *ex parte* communications between White House officials and the FCC, concluding that "*communications by the White House must be disclosed in the FCC rulemaking record if they are of substantial significance and clearly intended to affect the ultimate decision*") (emphasis added). In short, the *Order* and its administrative record leave us with many questions about the involvement of the President and his staff—questions made significant by us knowing enough to know that the President's involvement was outcome determinative.

Perhaps the involved parties thought the President's public advocacy of "net neutrality" through reclassifying broadband Internet access provided sufficient accountability; excusing the White House from following the FCC's rules. Perhaps the FCC paid no mind to the matter because of the many filed comments endorsing some form of "net neutrality" regulation during the comment period. Whatever the thinking, this course "effectively created two very different proceedings: First there was the FCC's conventional notice-and-comment proceeding replete with its formalized procedures and deadlines regarding the submission of comments and *ex parte* contacts. Next emerged a different, more real-world proceeding," the one where the President provided outcome-determinative influence. *See* Watts, *Controlling Presidential Control*, 114 MICH. L. REV. at 741. This "leav[es] the notice-and-comment proceeding and the political proceeding disconnected from one another and mak[es] the notice-and-comment process look like no more than a smokescreen." *See id.* Rules are only for Americans who lack friends in high places.

To be clear, I am not suggesting the President has no legitimate means of interjecting himself into an agency's rulemaking process. Nor am I suggesting that the President should not bring an independent agency's executive actions within the Executive Branch. *See Free Enter. Fund. v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 499 (2010) ("One can have a government that functions without being ruled by functionaries, and a government that benefits from expertise without being ruled by experts. Our Constitution was adopted to enable the people to govern themselves, through their elected leaders. The growth of the Executive Branch, which now wields vast power and touches almost every aspect of daily life, heightens the concern that it may slip from the Executive's control, and thus from that of the people."). Rather, my assertion follows from the nature of executive Power.

Executive Branch authority over the execution and enforcement of existing law is, in part, meant to ensure our government's republican form—thereby remaining publicly accountable. Some Presidents, in the name of shaping an agency's direction, "might accept a novel practice that violates Article II," but "'the separation of powers does not depend on the views of individual Presidents . . . .'" *PHH Corp.*, 839 F.3d at 35 (quoting *Free Enterprise Fund*, 561 U.S. at 497). The Constitution's structural features are, themselves, legal procedures designed to safeguard liberty by preserving public accountability against the current moment's political priorities. A President may attempt to shape an agency's deliberations so as to vindicate the Constitution's structural allocation of power; ensuring the exercise of executive Power is consistent with the publicly-accountable executive. *See, e.g.*, *Costle*, 657 F.2d at 405 ("The executive power under our Constitution, after all, is not shared[;] it rests exclusively with the President. . . . [T]he Founders chose to risk the potential for tyranny inherent in

placing power in one person, in order to gain the advantages of accountability fixed on a single source."). But if the *means* by which the President seeks to shape the agency's deliberations transgress legal procedures designed to ensure public accountability—like notice-and-comment requirements and rules regarding *ex parte* communications—he undermines the accountability rationale for confining executive Power to the President. *Cf.* Elena Kagan, *Presidential Administration*, 114 HARV. L. REV. 2245, 2332 (2001) (characterizing "the degree to which the public can understand the sources and levers of bureaucratic action" as a "fundamental precondition of accountability in administration"). Acting with concern for public accountability seems especially salient when the President "and his White House staff" seek to exert influence over the direction of an ostensibly-independent agency. *Cf. Costle*, 657 F.2d at 405–06 ("In the particular case of EPA, Presidential authority is clear since it has never been considered an 'independent agency,' but always part of the Executive Branch."). Perchance something else explains the White House's conduct here than attempting to confine the exercise of executive Power to the President. But, rather than acknowledge the double standard the President's involvement created between the American People and their Chief Executive, the FCC opted for the silent treatment. This Court has no such luxury. "[S]ome might think that judges should simply defer to the elected branches' design of the administrative state. But that hands-off attitude would flout a long, long line of Supreme Court precedent." *PHH Corp.*, 839 F.3d at 35. Unfortunately, under this Court's Opinion, the American People will never know quite how the government came to regulate their Internet access so pervasively.

*B.*

*Reclassification Is Not A "Faithful" Execution Of Existing Law*

The questions of substance regarding the President's involvement here go to the core of our Constitution's separation of executive and legislative Power.

The nature of executive Power differs depending upon whether the President is *executing* law, *or seeking a change* in existing law. In the former context, the President is *required* to "faithfully" execute the law. *See* U.S. CONST. Art. II, § 3, cl. 5;[7] *see also* Robert G. Natelson, *The Original Meaning of the Constitution's "Executive Vesting Clause,"* 31 WHITT. L. REV. 1, 14 & n.59 (2009) (discussing Article II's Take Care Clause as a "power-conferring" text historically "reminiscent" of "royal instructions" to act as an agent). "In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952); *United States v. Midwest Oil Co.*, 236 U.S. 459, 505 (1915) ("The Constitution does not confer upon [the President] any power to enact laws or to suspend or repeal such as the Congress enacts."). The lawmaking power belongs exclusively to Congress, not to agencies. *See City of Arlington*, 133 S. Ct. at 1873 n.4. When the President petitions Congress to change the law, however, he, necessarily, need not advocate a position "faithful" to existing law. *See* U.S. CONST. Art. II, § 3, cl. 2

---

[7] The President's obligation under the Take Care Clause does not extend to laws the President considers unconstitutional, nor does it prohibit prosecutorial discretion. But, otherwise, "the Executive has to follow and comply with laws regulating the executive branch." *See* Brett M. Kavanaugh, *Our Anchor for 225 Years and Counting: The Enduring Significance of the Precise Text of the Constitution*, 89 NOTRE DAME L. REV. 1907, 1911 (2014).

(authorizing the President to "recommend such measures as he shall judge necessary and expedient").

To be sure, the creation of agency rules can muddle these distinct aspects of executive Power. "Because most regulatory statutes have multiple goals and are not written with crystal clarity, the agency often has considerable interpretational leeway before it steps over the statutory line, and the President may attempt to push the agency as close to that line as possible." Thomas O. McGarity, *Presidential Control of Regulatory Agency Decisionmaking*, 36 AM. U.L. REV. 443, 454 (1987). Our Constitution ensures that the line remains, however. *Cf.* THE FEDERALIST NO. 73 (Hamilton), p. 441 (Clinton Rossiter ed., 1961) (adhering to the separation of powers avoids "the legislative and executive powers . . . com[ing] to be blended in the same hands"). "An activist President with control over the rulemaking process could use his power to press agencies beyond statutory limits that he was unable to persuade Congress to remove. Such a President would be guilty of unfaithful execution of the laws." McGarity*, Presidential Control of Regulatory Agency Decisionmaking*, 36 AM. U.L. REV. at 455. A "related problem" "occurs when members of the President's staff attempt to implement their own policy agendas in the name of the President." *See id.* Given the outcome-determinative nature of the President's involvement on the reclassification of broadband Internet access—and the clarity with which Congress set forth its deregulatory policy and standards in the 1996 Act—the question of how the President upheld his Take Care Clause obligation in urging the FCC to reclassify Internet access arises.

Here, the President did not ask the FCC to enforce "a congressional policy . . . in a manner prescribed by Congress;" instead, he called on FCC to "execute" a "presidential policy"

preference on net neutrality "in a manner prescribed by the President." *Youngstown*, 343 U.S. at 588. The President did not ask Congress to reclassify broadband Internet access as a "telecommunications service" and implement "net neutrality" through public utility regulation. Rather, the President urged *the FCC* to *reject* Congress's deregulatory aims and its classification of Internet access to further his preferred approach to "net neutrality." As explained above, the classification of Internet access as "information service" is a core feature of the 1996 Act. The use of forbearance to lessen, rather than expand common carrier regulation, and the prohibition on treating mobile broadband Internet access as common carriage are all part of the 1996 Act's deregulatory text, history, and structure. Nevertheless, the President sought to *change* this law not by petitioning Congress, but by influencing the FCC's deliberations over how to *enforce* existing law. The President's conduct collapsed the distinction between his constitutional authority to seek changes in the law from the legislature, and his constitutional *obligation* to faithfully execute the law passed by Congress when interacting with the agency charged with executing the law.

The President's obligation to "faithfully" execute existing law limits the realm of reasonable constructions he can provide to those charged with enforcing existing law. For example, during the "Quasi War" with France, Congress passed a statute permitting the seizure of any U.S. ship *bound for* France or its dependent powers. When President Adams sent the statute to the military for execution, he reinterpreted the statute— allowing for the seizure of any U.S. ship going "*to or from* Fr[e]nch ports." *See Little v. Barreme*, 6 U.S. (2 Cranch) 170, 178 (1804) (emphasis added). The Supreme Court affirmed the Circuit Court's finding that the seizure of a U.S. ship from French-controlled Haiti (then Jérémie) to Danish-controlled St. Thomas was invalid. Writing for the Court, Chief Justice

Marshall said it did not matter that the President's construction was motivated by it being "obvious[] that if only vessels sailing to a French port could be seized on the high seas that the law would very often be evaded." *Id.* Congress, the Marshall Court said, "prescribed [] the manner in which this law shall be carried into execution," and that "was to exclude a seizure of any vessel not bound to a French port." *Id.* at 177–78. President Adams, however, gave it a "different construction," *id.* at 178, one at odds with what Congress passed in both the statute's "general clause" stating its purpose and the statute's more specific limitations, *id.* at 177–78.

Similarly here,[8] the President urged the FCC to adopt a construction of Internet classification at odds with both the "general clause[s]" of the 1996 Act's deregulatory policy and the statute's more specific definitions of "interactive computer service," "information service," "Internet access service," "interconnected service," and "the public switched network." No doubt the President thought reclassifying broadband

---

[8] That the military is under the President's command and the FCC is an independent agency is of no moment here. The issue here is not the *scope* of the President's authority to enforce the law (i.e., the extent to which the President can "direct" the FCC to act). Rather, the issue here is the *nature* of the authority the President exercises when seeking to change the *enforcement* of existing law. Enforcement authority cannot be conflated with the President's separate and distinct ability to petition for changes in existing law itself. Nevertheless, as explained above, that is what the President attempted. It is no answer to say the President's action is not subject to judicial direction. *See Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 499 (1867). I do not dispute that the Court cannot issue an order directing the President's "exercise of judgment" in law enforcement. *See id.* What is within this Court's determination, however, is whether the *Order* at issue faithfully executes existing law. It does not, and it does not because of the construction set forth by the President.

Internet access better captured the on-the-ground realities of Internet access. But, as in *Barreme*, Congress "prescribed [] the manner in which this law shall be carried into execution," and the President is limited to urging the execution of existing law with legal constructions that faithfully execute what Congress enacted. *See id.* at 177–78. As Justice Jackson famously put it, "[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).

The President's intervention did not result from a "failure of Congress to legislate" on the issue of Internet access regulation, but because he desired "a different and inconsistent way of his own" respecting that regulation. *See id.* at 639 (Jackson, J., concurring). The fact that Congress has, up until now, decided not to revise its 1996 Act with legislation amenable to President Obama's view of Internet regulation does not mean Congress has "failed" to act. Congress "acted" with respect to the classification of Internet access service in 1996—if President Obama thought a reclassification was needed, then Congress was the place to go. *See, e.g.*, *id.* at 603 (Frankfurter, J., concurring) (explaining that, five years before President Truman's steel seizure, "Congress said to the President, 'You may not seize. Please report to us and ask for seizure power if you think it is needed in a specific situation.'"). Nothing about our Constitution's deliberative legislative structure is meant to facilitate a one-way ratchet in the President's favor. *See id.* at 604 (Frankfurter, J., concurring) ("The need for new legislation does not enact it. Nor does it repeal or amend existing law."); THE FEDERALIST NO. 73 (Hamilton) p. 442 (Clinton Rosseiter ed., 1961) ("It may perhaps be said that the power of preventing bad laws includes that of preventing good ones . . . . But this objection will have little weight with those who can properly estimate the

mischiefs of that inconstancy and mutability in the laws . . . . They will consider every institution calculated to . . . keep things in the same state in which they happen to be at any given period as much more likely to do good than harm."). Nor does the Constitution give the President an "I'm-frustrated-with-democracy" exception to Bicameralism and Presentment; allowing him to petition the FCC, rather than Congress, for a change in existing law. *See NLRB v. Noel Canning*, 134 S. Ct. 2550, 2567 (2014) ("It should go without saying . . . that political opposition in the Senate would not qualify as an unusual circumstance" allowing the President to disregard constitutional limitations).

"With all its defects, delays and inconveniences, men have discovered no technique for long preserving free government except that the Executive be under the law, and that the law be made by parliamentary deliberations. . . . [I]t is the duty of the Court to be last, not first, to give [these institutions] up." *Youngstown*, 343 U.S. at 655 (Jackson, J., concurring). This issue deserved much more scrutiny than the silence given to it by this Court.

## V.

This *Order* shows signs of a government having grown beyond the consent of the governed: the collapsing respect for Bicameralism and Presentment; the administrative state shoehorning major questions into long-extant statutory provisions without congressional authorization; a preference for rent-seeking over liberty. This Court had an opportunity to see the wisdom of the "Man Controlling Trade" statue on Constitution Avenue, but we are no longer on the Constitution's path. Hopefully, there is a clearer view of the road back to a government of limited, enumerated power from

One First Street in our Capital City.  In that hope, I respectfully dissent from the Court's denial of rehearing *en banc*.

KAVANAUGH, *Circuit Judge*, dissenting from the denial of rehearing en banc:

The FCC's 2015 net neutrality rule is one of the most consequential regulations ever issued by any executive or independent agency in the history of the United States. The rule transforms the Internet by imposing common-carrier obligations on Internet service providers and thereby prohibiting Internet service providers from exercising editorial control over the content they transmit to consumers. The rule will affect every Internet service provider, every Internet content provider, and every Internet consumer. The economic and political significance of the rule is vast.

The net neutrality rule is unlawful and must be vacated, however, for two alternative and independent reasons.

First, Congress did not clearly authorize the FCC to issue the net neutrality rule. Congress has debated net neutrality for many years, but Congress has never enacted net neutrality legislation or clearly authorized the FCC to impose common-carrier obligations on Internet service providers. The lack of clear congressional authorization matters. In a series of important cases over the last 25 years, the Supreme Court has required *clear* congressional authorization for major agency rules of this kind. The Court, speaking through Justice Scalia, recently summarized the major rules doctrine in this way: "We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'" *Utility Air Regulatory Group v. EPA*, 134 S. Ct. 2427, 2444, slip op. at 19 (2014) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000)). The major rules doctrine helps preserve the separation of powers and operates as a vital check on expansive and aggressive assertions of executive authority.

Here, because Congress never passed net neutrality legislation, the FCC relied on the 1934 Communications Act, as amended in 1996, as its source of authority for the net neutrality rule. But that Act does not supply *clear* congressional authorization for the FCC to impose common-carrier regulation on Internet service providers. Therefore, under the Supreme Court's precedents applying the major rules doctrine, the net neutrality rule is unlawful.

Second and in the alternative, the net neutrality rule violates the First Amendment to the U.S. Constitution. Under the Supreme Court's landmark decisions in *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622 (1994), and *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180 (1997), the First Amendment bars the Government from restricting the editorial discretion of Internet service providers, absent a showing that an Internet service provider possesses market power in a relevant geographic market. Here, however, the FCC has not even tried to make a market power showing. Therefore, under the Supreme Court's precedents applying the First Amendment, the net neutrality rule violates the First Amendment.

In short, although the briefs and commentary about the net neutrality issue are voluminous, the legal analysis is straightforward: If the Supreme Court's major rules doctrine means what it says, then the net neutrality rule is unlawful because Congress has not clearly authorized the FCC to issue this major rule. And if the Supreme Court's *Turner Broadcasting* decisions mean what they say, then the net neutrality rule is unlawful because the rule impermissibly infringes on the Internet service providers' editorial discretion. To state the obvious, the Supreme Court could always refine or reconsider the major rules doctrine or its decisions in the *Turner Broadcasting* cases. But as a lower

court, we do not possess that power. Our job is to apply Supreme Court precedent as it stands.

For those two alternative and independent reasons, the FCC's net neutrality regulation is unlawful and must be vacated. I respectfully disagree with the panel majority's contrary decision and, given the exceptional importance of the issue, respectfully dissent from the denial of rehearing en banc.[1]

I

The FCC's net neutrality rule is a major rule, but Congress has not clearly authorized the FCC to issue the rule. For that reason alone, the rule is unlawful.

A

The Framers of the Constitution viewed the separation of powers as the great safeguard of liberty in the new National Government. To protect liberty, the Constitution divides power among the three branches of the National Government. The Constitution vests Congress with the legislative power. U.S. CONST. art. I, § 1. The Constitution vests the President with the executive power, including the responsibility to "take

---

[1] I also agree with much of Judge Williams' panel dissent and with much of Part III.A and Part III.B of Judge Brown's dissent from denial of rehearing en banc.

The concurrence in the denial of rehearing en banc suggests that the FCC may withdraw the net neutrality rule, mitigating any need for en banc review now. Unless and until the FCC does so, however, the panel opinion will remain the law of the Circuit. If the panel were to withdraw its opinion or if the opinion gets vacated as moot, then the need for en banc review would go away as well. But not until then, in my judgment.

Care that the Laws be faithfully executed." *Id.* art. II, § 1, cl. 1; *id.* § 3. The Constitution vests the Judiciary with the judicial power, including the power in appropriate cases to determine whether the Executive has acted consistently with the Constitution and statutes. *See id.* art. III, §§ 1, 2; *Marbury v. Madison*, 5 U.S. 137 (1803).

Under the Constitution's separation of powers, Congress makes the laws, and the Executive implements and enforces the laws. The Executive Branch does not possess a general, free-standing authority to issue binding legal rules. The Executive may issue rules only pursuant to and consistent with a grant of authority from Congress (or a grant of authority directly from the Constitution). *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).

When the Judiciary exercises its Article III authority to determine whether an agency's rule is consistent with a governing statute, two competing canons of statutory interpretation come into play.

First, for ordinary agency rules, the Supreme Court applies what is known as *Chevron* deference to authoritative agency interpretations of statutes. If the statute is clear, the agency must follow the statute. But if the statute is ambiguous, the agency has discretion to adopt its own preferred interpretation, so long as that interpretation is at least reasonable. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-45 (1984). The theory of *Chevron* is that a statutory ambiguity or gap reflects Congress's implicit delegation of authority for the agency to make policy and issue rules within the reasonable range of the statutory ambiguity or gap.

Second, in a narrow class of cases involving major agency rules of great economic and political significance, the Supreme Court has articulated a countervailing canon that constrains the Executive and helps to maintain the Constitution's separation of powers. For an agency to issue a major rule, Congress must *clearly* authorize the agency to do so. If a statute only *ambiguously* supplies authority for the major rule, the rule is unlawful. This major rules doctrine (usually called the major questions doctrine) is grounded in two overlapping and reinforcing presumptions: (i) a separation of powers-based presumption against the delegation of major lawmaking authority from Congress to the Executive Branch, *see Industrial Union Department, AFL-CIO v. American Petroleum Institute*, 448 U.S. 607, 645-46 (1980) (opinion of Stevens, J.), and (ii) a presumption that Congress intends to make major policy decisions itself, not leave those decisions to agencies.

In short, while the *Chevron* doctrine *allows* an agency to rely on statutory ambiguity to issue *ordinary* rules, the major rules doctrine *prevents* an agency from relying on statutory ambiguity to issue *major* rules.

Justice Breyer appears to have been the first to describe a dichotomy between ordinary and major rules and to articulate the major rules doctrine as a distinct principle of statutory interpretation. In an article written more than 30 years ago, he explained the principle this way: When determining "the extent to which Congress intended that courts should defer to the agency's view of the proper interpretation," courts should take into account the legislative reality that Congress may grant the Executive Branch the authority to resolve various "interstitial matters," but Congress itself is "more likely to have focused upon, and answered, major questions." Stephen Breyer, *Judicial Review of Questions of Law and Policy*, 38

Admin. L. Rev. 363, 370 (1986). Citing Justice Breyer's 1986 article, the Supreme Court later explained that, in "extraordinary cases," Congress could not have "intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159, 160 (2000).

In keeping with the principle articulated by Justice Breyer, the Supreme Court has repeatedly rejected agency attempts to take major regulatory action without *clear* congressional authorization. Consider the following examples:

- *MCI Telecommunications Corp. v. American Telephone & Telegraph Co.*, 512 U.S. 218 (1994). The Communications Act of 1934 gave the FCC authority to "modify" rate-filing requirements. The FCC issued a rule that completely exempted certain telephone companies from rate-filing requirements. The Court struck down the rule, holding that the FCC's authority to *modify* statutory requirements did not permit the agency to *eliminate* those requirements. It would have been a major step for the FCC to eliminate those requirements. Yet there was no clear statutory authority for the FCC to do so. The Court explained that it was "highly unlikely that Congress would leave the determination of whether an industry will be entirely, or even substantially, rate-regulated to agency discretion." *Id.* at 231.
- *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000). The Food, Drug, and Cosmetic Act gave the FDA broad and general authority to regulate "drugs" and "devices." The FDA attempted to use this general authority to regulate the tobacco industry,

including cigarettes. Regulating cigarettes would have been a major economic and political action. Yet there was no clear statutory authorization for the FDA to regulate the tobacco industry generally, or cigarettes specifically. The Court thus invalidated the rule, stating that it was "confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion." *Id.* at 160.

- *Gonzales v. Oregon*, 546 U.S. 243 (2006). The Controlled Substances Act gave the Attorney General authority to de-register physicians, thus preventing them from writing prescriptions for certain drugs, if the Attorney General concluded that de-registration was in the "public interest." The Attorney General issued an interpretive rule declaring that physicians could not prescribe controlled substances for assisted suicides. It would have been a major step for the Attorney General to proscribe physician-assisted suicide in this way. Yet there was no clear statutory authority for the Attorney General to do so. The Court therefore rejected the rule, stating that it "would be anomalous for Congress to have so painstakingly described the Attorney General's limited authority to deregister a single physician or schedule a single drug, but to have given him, just by implication, authority to declare an entire class of activity outside the course of professional practice." *Id.* at 262 (internal quotation marks omitted). "The idea that Congress gave the Attorney General such broad and unusual authority through an implicit delegation in the CSA's registration provision is not sustainable." *Id.* at 267.

- *Utility Air Regulatory Group v. EPA*, 134 S. Ct. 2427 (2014). Various parts of the Clean Air Act gave the Environmental Protection Agency authority to

regulate "any air pollutant." It was not clear whether greenhouse gases were air pollutants for all Clean Air Act programs. The EPA nonetheless promulgated a rule subjecting millions of previously unregulated emitters of greenhouse gases to burdensome permitting regulations under the Clean Air Act's Prevention of Significant Deterioration and Title V permitting programs. It would have been a major step for EPA to regulate the greenhouse gas emissions of so many large and small facilities. But there was no clear statutory authorization for the EPA to do so. As a result, the Supreme Court vacated the relevant part of the rule, stating: "When an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,' we typically greet its announcement with a measure of skepticism. We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'" *Id.* at 2444, slip op. at 19 (quoting *Brown & Williamson*, 529 U.S. at 159, 160) (citation omitted).[2]

---

[2] For completeness, two other cases warrant mention. *First*, in *Massachusetts v. EPA*, 549 U.S. 497 (2007), the Court concluded that the Clean Air Act's provision for the regulation of new motor vehicles clearly authorized EPA to regulate the greenhouse gas emissions of those vehicles, once EPA made a finding that greenhouse gases may endanger the public health. *See id.* at 528-29. So even though such a rule would presumably be a major rule, the statute clearly authorized it, according to the Court. In *UARG*, by contrast, the Court concluded that the Clean Air Act's Prevention of Significant Deterioration and Title V permitting programs did not clearly authorize EPA to regulate emitters of greenhouse gases under those programs.

*Second*, in *King v. Burwell*, 135 S. Ct. 2480 (2015), the Court applied a form of the major rules doctrine and stated that *Chevron*

The lesson from those cases is apparent. If an agency wants to exercise expansive regulatory authority over some major social or economic activity – regulating cigarettes, banning physician-assisted suicide, eliminating telecommunications rate-filing requirements, or regulating greenhouse gas emitters, for example – an *ambiguous* grant of statutory authority is not enough. Congress must *clearly* authorize an agency to take such a major regulatory action.[3]

Consistent with the Supreme Court case law, leading scholars on statutory interpretation have recognized the significance of the major rules doctrine. Professor Eskridge has explained the doctrine this way: The "Supreme Court has carved out a potentially important exception to delegation, the

---

deference did not apply to the major question of whether the Affordable Care Act authorized government subsidies to individuals who obtained health insurance on exchanges established by the Federal Government. *Id.* at 2488-89, slip op. at 8. That case is somewhat different from the prototypical major rules cases because the agency in that particular rule was not seeking to regulate or de-regulate (as opposed to tax or subsidize) some major private activity. Rather, the case concerned the scope of government subsidies under the health care statute. The case therefore seems to stand for the distinct proposition that *Chevron* deference may not apply when an agency interprets a major government benefits or appropriations provision of a statute.

[3] This Court has also employed the major rules doctrine. *See, e.g.*, *District of Columbia v. Department of Labor*, 819 F.3d 444, 446 (D.C. Cir. 2016) (rejecting the Department of Labor's interpretation of the Davis-Bacon Act, which regulates public works, to apply to construction of privately funded, owned, and operated buildings); *Loving v. IRS*, 742 F.3d 1013, 1021 (D.C. Cir. 2014) (rejecting the Internal Revenue Service's interpretation of a tax statute to authorize new regulation of hundreds of thousands of tax-return preparers).

*major questions canon.* Even if Congress has delegated an agency general rulemaking or adjudicatory power, judges presume that Congress does not delegate its authority to settle or amend major social and economic policy decisions." WILLIAM N. ESKRIDGE JR., INTERPRETING LAW: A PRIMER ON HOW TO READ STATUTES AND THE CONSTITUTION 288 (2016). The "key reason" for the doctrine, Professor Eskridge has explained, "is the strong presumption of continuity for major policies unless and until Congress has deliberated about and enacted a change in those major policies . . . . Because a major policy change should be made by the most democratically accountable process—Article I, Section 7 legislation—this kind of continuity is consistent with democratic values." *Id.* at 289.

In their landmark study of Congress's statutory drafting practices, Professors Gluck and Bressman likewise stated that "the major questions doctrine is a departure from *Chevron*'s simple presumption of delegation. In particular, that doctrine supports a presumption of *non*delegation in the face of statutory ambiguity over major policy questions or questions of major political or economic significance." Abbe R. Gluck & Lisa Schultz Bressman, *Statutory Interpretation from the Inside—An Empirical Study of Congressional Drafting, Delegation, and the Canons: Part I*, 65 Stan. L. Rev. 901, 1003 (2013). Their empirical study concluded that the major rules doctrine reflects congressional intent and accords with the in-the-arena reality of how legislators and congressional staff approach the legislative function. As one congressional official put it to them: "Major policy questions, major economic questions, major political questions, preemption questions are all the same. Drafters don't intend to leave

them unresolved." *Id.* at 1004 (internal quotation marks and alterations omitted).[4]

In short, the major rules doctrine constitutes an important principle of statutory interpretation in agency cases. As a lower court, we must follow the major rules doctrine as it has been articulated by the Supreme Court.

## B

In order for the FCC to issue a major rule, Congress must provide clear authorization. We therefore must address two questions in this case: (1) Is the net neutrality rule a major rule? (2) If so, has Congress clearly authorized the FCC to issue the net neutrality rule?

## 1

The FCC's net neutrality rule is a major rule for purposes of the Supreme Court's major rules doctrine. Indeed, I believe that proposition is indisputable.

The Supreme Court has described major rules as those of "vast 'economic and political significance.'" *UARG*, 134 S. Ct. at 2444, slip op. at 19 (quoting *Brown & Williamson*, 529

---

[4] Some commentators do not believe that there should be a major rules doctrine. *See, e.g.*, Lisa Heinzerling, *The Power Canons*, 58 Wm. & Mary L. Rev. (forthcoming 2017); Kevin O. Leske, *Major Questions About the "Major Questions" Doctrine*, 5 Mich. J. Envtl. & Admin. L. 479 (2016). But as a lower court, we are constrained by precedent. The Supreme Court has articulated and applied the major rules doctrine in a series of high-profile and important cases. As a lower court, we cannot dismiss the Court's repeated invocations of the doctrine as casual or meaningless asides. We cannot airbrush the cases out of the picture.

U.S at 160). The Court has not articulated a bright-line test that distinguishes major rules from ordinary rules. As a general matter, however, the Court's cases indicate that a number of factors are relevant, including: the amount of money involved for regulated and affected parties, the overall impact on the economy, the number of people affected, and the degree of congressional and public attention to the issue. *See UARG*, 134 S. Ct. at 2443-44, slip op. at 17-19 (regulation would impose massive compliance costs on millions of previously unregulated emitters); *Gonzales v. Oregon*, 546 U.S. at 267 (physician-assisted suicide is an important issue subject to "earnest and profound debate across the country"); *Brown & Williamson*, 529 U.S. at 126-27, 133, 143-61 (FDA's asserted authority would give it expansive power over tobacco industry, which was previously unregulated under the relevant statute); *MCI*, 512 U.S. at 230, 231 (rate-filing requirements are "utterly central" and of "enormous importance" to the statutory scheme). The Court's concern about an agency's issuance of a seemingly major rule is heightened, moreover, when an agency relies on a long-extant statute to support the agency's bold new assertion of regulatory authority. *See UARG*, 134 S. Ct. at 2444, slip op. at 19.

To be sure, determining whether a rule constitutes a major rule sometimes has a bit of a "know it when you see it" quality. So there inevitably will be close cases and debates at the margins about whether a rule qualifies as major. But under any conceivable test for what makes a rule major, the net neutrality rule qualifies as a major rule.

The net neutrality rule is a major rule because it imposes common-carrier regulation on Internet service providers. (A common carrier generally must carry all traffic on an equal basis without unreasonable discrimination as to price and

carriage.) In so doing, the net neutrality rule fundamentally transforms the Internet by prohibiting Internet service providers from choosing the content they want to transmit to consumers and from fully responding to their customers' preferences. The rule therefore wrests control of the Internet from the people and private Internet service providers and gives control to the Government. The rule will affect every Internet service provider, every Internet content provider, and every Internet consumer. The financial impact of the rule – in terms of the portion of the economy affected, as well as the impact on investment in infrastructure, content, and business – is staggering. Not surprisingly, consumer interest groups and industry groups alike have mobilized extraordinary resources to influence the outcome of the policy discussions.

Moreover, Congress and the public have paid close attention to the issue. Congress has been studying and debating net neutrality regulation for years. It has considered (but never passed) a variety of bills relating to net neutrality and the imposition of common-carrier regulations on Internet service providers. *See, e.g.*, H.R. 5252, 109th Cong. (2006); H.R. 5273, 109th Cong. (2006); H.R. 5417, 109th Cong. (2006); S. 2360, 109th Cong. (2006); S. 2686, 109th Cong. (2006); S. 2917, 109th Cong. (2006); S. 215, 110th Cong. (2007); H.R. 5353, 110th Cong. (2008); H.R. 5994, 110th Cong. (2008); H.R. 3458, 111th Cong. (2009); S. 74, 112th Cong. (2011); S. 3703, 112th Cong. (2012); H.R. 2666, 114th Cong. (2016). The public has also focused intensely on the net neutrality debate. For example, when the issue was before the FCC, the agency received some 4 million comments on the proposed rule, apparently the largest number (by far) of comments that the FCC has ever received about a proposed rule. Indeed, even President Obama publicly weighed in on the net neutrality issue, an unusual presidential action when

an independent agency is considering a proposed rule. *See* Statement on Internet Neutrality, 2014 DAILY COMP. PRES. DOC. 841 (Nov. 10, 2014).  The President's intervention only underscores the enormous significance of the net neutrality issue.

In addition, as in other cases where the Supreme Court has held that the major rules doctrine applied, the FCC is relying here on a long-extant statute – namely, the Communications Act of 1934, as amended in 1996.   In *UARG*, the Supreme Court wrote the following:  "When an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,' we typically greet its announcement with a measure of skepticism.  We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'"  134 S. Ct. at 2444, slip op. at 19 (quoting *Brown & Williamson*, 529 U.S. at 159, 160) (citation omitted).  The Court in *UARG* might as well have been speaking about the net neutrality rule.  That *UARG* language is directly on point here.

The net neutrality rule is a major rule under any plausible conception of the major rules doctrine.  As Judge Brown rightly states, "any other conclusion would fail the straight-face test."  Brown Dissent at 18.

2

Because the net neutrality rule is a major rule, the next question is whether Congress *clearly* authorized the FCC to issue the net neutrality rule and impose common-carrier regulations on Internet service providers.  The answer is no.

Congress enacted the Communications Act in 1934 and amended it in 1996. The statute sets up different regulatory schemes for "telecommunications services" and "information services." To simplify for present purposes, the statute authorizes heavy common-carrier regulation of telecommunications services but light regulation of information services. (Recall that a common carrier generally must carry all traffic on an equal basis without unreasonable discrimination as to price and carriage.) The statute was originally designed to regulate telephone service providers as common carriers.

By the time of the 1996 amendments to the Act, the Internet had come into being. The 1996 amendments reflected that development. Among other things, the amendments articulated a general philosophy of limited regulation of the Internet. "It is the policy of the United States," Congress stated, "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation." 47 U.S.C. § 230(b).

In keeping with the express statutory philosophy of light regulation of the Internet, the FCC until 2015 regulated Internet service provided over cable systems as an information service, the lighter regulatory model. The 1934 Act (as amended in 1996) permits such light regulation of the Internet. What that Act does not clearly do is treat Internet service as a telecommunications service and thereby authorize the FCC to regulate Internet service providers as common carriers. At most, the Act is ambiguous about whether Internet service is an information service or a telecommunications service.

Since 1996, Congress has not passed a statute clearly classifying Internet service as a telecommunications service or otherwise giving the FCC authority to impose common-carrier regulations on Internet service providers. That inaction has not been the result of inattention. On the contrary, as noted above, Congress has been studying and debating the net neutrality issue for years. And Congress has considered a variety of bills relating to net neutrality and the imposition of common-carrier regulations on Internet service providers. But none of those bills has passed.

In 2015, notwithstanding the lack of clear congressional authorization, the FCC decided to unilaterally plow forward and issue its net neutrality rule. The rule classified Internet service as a telecommunications service and imposed onerous common-carrier regulations on Internet service providers. By doing so, the FCC's 2015 net neutrality rule upended the agency's traditional light-touch regulatory approach to the Internet.

The problem for the FCC is that Congress has not clearly authorized the FCC to classify Internet service as a telecommunications service and impose common-carrier obligations on Internet service providers. Indeed, not even the FCC claims that Internet service is *clearly* a telecommunications service under the statute. On the contrary, the FCC concedes that "the Communications Act did not clearly resolve the question of how broadband should be classified." FCC Opposition Br. 9. Therefore, by the FCC's own admission, Congress has not clearly authorized the FCC to subject Internet service providers to the range of burdensome common-carrier regulations associated with telecommunications services.

Under the major rules doctrine, that is the end of the game for the net neutrality rule: Congress must clearly authorize an agency to issue a major rule. And Congress has not done so here, as even the FCC admits.

To avoid that conclusion, the FCC relies almost exclusively on the Supreme Court's 2005 decision in *National Cable & Telecommunications Association v. Brand X Internet Services*, 545 U.S. 967 (2005). In *Brand X*, the FCC had classified Internet service over cable lines as an information service and, consistent with that classification, imposed only light regulation on Internet service providers. Various petitioners sued to try to force the FCC to classify Internet service as a telecommunications service and to impose common-carrier regulation on Internet service providers. The Supreme Court stated that the statute was ambiguous about whether Internet service was an information service or a telecommunications service. The Court applied *Chevron* deference and upheld the FCC's decision to classify Internet service as an information service and to subject Internet service providers to only light regulation.

Here, the FCC argues that, under *Brand X*, the agency has authority to classify Internet service as a telecommunications service because the statute is ambiguous. The FCC is badly mistaken. *Brand X*'s finding of statutory ambiguity cannot be the *source* of the FCC's authority to classify Internet service as a telecommunications service. Rather, under the major rules doctrine, *Brand X*'s finding of statutory ambiguity is a *bar* to the FCC's authority to classify Internet service as a telecommunications service.

Importantly, the *Brand X* Court did not have to – and did not – consider whether classifying Internet service as a telecommunications service and imposing common-carrier

regulation on the Internet would be consistent with the major rules doctrine. In other words, *Brand X* nowhere addressed the question presented in this case: namely, whether Congress has *clearly* authorized common-carrier regulation of Internet service providers.[5] Therefore, we must consider that question in the first instance. And that is where *Brand X*'s finding of statutory ambiguity actually torpedoes the FCC's current argument. *Brand X*'s finding of ambiguity by definition means that Congress has not clearly authorized the FCC to issue the net neutrality rule. And that means that the net neutrality rule is unlawful under the major rules doctrine.[6]

---

[5] One might wonder whether it was a major step for the FCC to impose even light-touch "information services" regulation on Internet service providers. The answer is no; indeed, apparently no Internet service provider raised such a claim in *Brand X*. The FCC's light-touch regulation did not entail common-carrier regulation and was not some major new regulatory step of vast economic and political significance. The rule at issue in *Brand X* therefore was an ordinary rule, not a major rule. As a result, the *Chevron* doctrine applied, not the major rules doctrine.

[6] The concurrence in the denial of rehearing en banc articulates what it describes as "two distinct species of ambiguity." Concurrence at 9. The concurrence distinguishes (i) whether the statute itself clearly classifies Internet service providers as telecommunications providers and (ii) whether the statute clearly authorizes the agency to classify Internet service providers as telecommunications providers. I agree that those are two distinct questions. But the answer to both questions is no. I see no statutory language that, in the concurrence's words, "clearly classifies ISPs as telecommunications providers" or "clearly authorizes the *agency* to classify ISPs as telecommunications providers." *Id.* Nor did *Brand X*, as I read it, say either of those two things.

19

* * *

The FCC adopted the net neutrality rule because the agency believed the rule to be wise policy and because Congress would not pass it. The net neutrality rule might be wise policy. But even assuming that the net neutrality rule is wise policy, congressional inaction does not license the Executive Branch to take matters into its own hands. Far from it. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 636 (2006) (Breyer, J., concurring) (gravely serious policy problem is nonetheless not a "blank check" for the Executive Branch to address the problem); *Youngstown Sheet & Tube Co.*, 343 U.S. 579 (Jackson, J., concurring). Under our system of separation of powers, an agency may act only pursuant to statutory authority and may not exceed that authority. For major rules, moreover, the agency must have *clear* congressional authorization. The net neutrality rule is a major rule. But Congress has not *clearly* authorized the FCC to issue that rule. Under the Supreme Court's major rules doctrine, the net neutrality rule is therefore unlawful and must be vacated.[7]

II

The net neutrality rule is unlawful for an alternative and independent reason. The rule violates the First Amendment, as that Amendment has been interpreted by the Supreme

---

[7] If the major rules doctrine meant only that *Chevron* did not apply, but did not go so far as to require clear congressional authorization for a major rule, we would then simply determine the better reading of this statute without a thumb on the scale in either direction. It is not necessary to delve deeply into that hypothetical inquiry here, but the better reading of this statute is that Internet service is an information service, as Judge Brown has explained. *See* Brown Dissent at 3-5.

Court. Absent a demonstration that an Internet service provider possesses market power in a relevant geographic market – a demonstration that the FCC concedes it did not make here – imposing common-carrier regulations on Internet service providers violates the First Amendment.

A

The threshold question is whether the First Amendment applies to Internet service providers when they exercise editorial discretion and choose what content to carry and not to carry. The answer is yes.

Article I of the Constitution affords Congress substantial power to regulate interstate commerce. But the First Amendment demands that the Government employ a more "laissez-faire regime" for the press and other editors and speakers in the communications marketplace. *Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 161 (1973) (Douglas, J., concurring in judgment).

Ratified in 1791, the First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press." U.S. CONST. amend. I. The First Amendment protects an independent media and an independent communications marketplace against takeover efforts by the Legislative and Executive Branches. The First Amendment operates as a vital guarantee of democratic self-government.

At the time of the Founding, the First Amendment protected (among other things) the editorial discretion of the many publishers, newspapers, and pamphleteers who produced and supplied written communications to the citizens

of the United States. For example, the Federal Government could not tell newspapers that they had to publish letters or commentary from all citizens, or from citizens who had different viewpoints. The Federal Government could not compel book publishers to accept and promote all books on equal terms or to publish books from authors with different perspectives. As Benjamin Franklin once remarked, his newspaper "was not a stagecoach, with seats for everyone." *Columbia Broadcasting System*, 412 U.S. at 152 (Douglas, J., concurring in judgment) (quoting FRANK LUTHER MOTT, AMERICAN JOURNALISM: A HISTORY, 1690-1960, at 55 (3d ed. 1962)).

The Supreme Court's landmark decisions in *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622 (1994), and *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180 (1997) (*Turner Broadcasting II*), established that those foundational First Amendment principles apply to editors and speakers in the modern communications marketplace in much the same way that the principles apply to the newspapers, magazines, pamphleteers, publishers, bookstores, and newsstands traditionally protected by the First Amendment.

The *Turner Broadcasting* cases addressed "must-carry" regulation of cable operators. The relevant statute required cable operators to carry certain local and public television stations. Proponents of must-carry regulation argued that the First Amendment posed little barrier to must-carry regulation because cable operators merely operated the pipes that transmitted third-party content and did not exercise the kind of editorial discretion that was traditionally protected by the First Amendment.

The Supreme Court, speaking though Justice Kennedy in both *Turner Broadcasting* cases, rejected that threshold

argument out of hand. The Court held that "cable operators engage in and transmit speech, and they are entitled to the protection of the speech and press provisions of the First Amendment." *Turner Broadcasting*, 512 U.S. at 636. As the Court recognized, cable operators deliver television content to subscribers. Although the cable operators may not always generate that content themselves, they decide what content to transmit. That decision, the Supreme Court stated, constitutes an act of editorial discretion receiving First Amendment protection. In the Court's words: "Through 'original programming or by exercising editorial discretion over which stations or programs to include in its repertoire,' cable programmers and operators 'seek to communicate messages on a wide variety of topics and in a wide variety of formats.'" *Id.* (alteration omitted) (quoting *Los Angeles v. Preferred Communications, Inc.*, 476 U.S. 488, 494 (1986)); *see also Arkansas Educational Television Commission v. Forbes*, 523 U.S. 666, 674 (1998) ("Although programming decisions often involve the compilation of the speech of third parties, the decisions nonetheless constitute communicative acts.").

The Court's ultimate conclusion on that threshold First Amendment point was not obvious beforehand. One could have imagined the Court saying that cable operators merely operate the transmission pipes and are not traditional editors. One could have imagined the Court comparing cable operators to electricity providers, trucking companies, and railroads – all entities subject to traditional economic regulation. But that was not the analytical path charted by the *Turner Broadcasting* Court. Instead, the Court analogized the cable operators to the publishers, pamphleteers, and bookstore owners traditionally protected by the First Amendment. As *Turner Broadcasting* concluded, the First Amendment's basic principles "do not vary when a new and different medium for communication appears" – although there of course can be

some differences in how the ultimate First Amendment analysis plays out depending on the nature of (and competition in) a particular communications market. *Brown v. Entertainment Merchants Association*, 564 U.S. 786, 790 (2011) (internal quotation mark omitted).

Here, of course, we deal with Internet service providers, not cable television operators. But Internet service providers and cable operators perform the same kinds of functions in their respective networks. Just like cable operators, Internet service providers deliver content to consumers. Internet service providers may not necessarily generate much content of their own, but they may decide what content they will transmit, just as cable operators decide what content they will transmit. Deciding whether and how to transmit ESPN and deciding whether and how to transmit ESPN.com are not meaningfully different for First Amendment purposes.

Indeed, some of the same entities that provide cable television service – colloquially known as cable companies – provide Internet access over the very same wires. If those entities receive First Amendment protection when they transmit television stations and networks, they likewise receive First Amendment protection when they transmit Internet content. It would be entirely illogical to conclude otherwise. In short, Internet service providers enjoy First Amendment protection of their rights to speak and exercise editorial discretion, just as cable operators do.

The FCC advances two primary arguments in its effort to distinguish *Turner Broadcasting* and demonstrate that there is no real First Amendment issue here.

*First*, the FCC argues (and the panel agreed) that *Turner Broadcasting* does not apply in this case because many

Internet service providers do not actually exercise editorial discretion to favor some content over others. Many Internet service providers simply allow access to all Internet content providers on an equal basis. For that reason, the FCC contends that it may prevent Internet service providers from exercising their editorial discretion or speech rights to favor some content or disfavor other content.

I find that argument mystifying. The FCC's "use it or lose it" theory of First Amendment rights finds no support in the Constitution or precedent. The FCC's theory is circular, in essence saying: "They have no First Amendment rights because they have not been regularly exercising any First Amendment rights and therefore they have no First Amendment rights." It may be true that some, many, or even most Internet service providers have chosen not to exercise much editorial discretion, and instead have decided to allow most or all Internet content to be transmitted on an equal basis. But that "carry all comers" decision itself is an exercise of editorial discretion. Moreover, the fact that the Internet service providers have not been aggressively exercising their editorial discretion does not mean that they have no *right* to exercise their editorial discretion. That would be akin to arguing that people lose the right to vote if they sit out a few elections. Or citizens lose the right to protest if they have not protested before. Or a bookstore loses the right to display its favored books if it has not done so recently. That is not how constitutional rights work. The FCC's "use it or lose it" theory is wholly foreign to the First Amendment.

Relatedly, the FCC claims that, under the net neutrality rule, an Internet service provider supposedly may opt out of the rule by choosing to carry only *some* Internet content. But even under the FCC's description of the rule, an Internet service provider that chooses to carry most or all content still

is not allowed to *favor* some content over other content when it comes to price, speed, and availability. That half-baked regulatory approach is just as foreign to the First Amendment. If a bookstore (or Amazon) decides to carry all books, may the Government then force the bookstore (or Amazon) to feature and promote all books in the same manner? If a newsstand carries all newspapers, may the Government force the newsstand to display all newspapers in the same way? May the Government force the newsstand to price them all equally? Of course not. There is no such theory of the First Amendment. Here, either Internet service providers have a right to exercise editorial discretion, or they do not. If they have a right to exercise editorial discretion, the choice of whether and how to exercise that editorial discretion is up to them, not up to the Government.

Think about what the FCC is saying: Under the rule, you supposedly can exercise your editorial discretion to refuse to carry some Internet content. But if you choose to carry most or all Internet content, you cannot exercise your editorial discretion to favor some content over other content. What First Amendment case or principle supports that theory? Crickets.[8]

---

[8] The concurrence in the denial of rehearing en banc seems to suggest that the net neutrality rule is voluntary. According to the concurrence, Internet service providers may comply with the net neutrality rule if they want to comply, but can choose not to comply if they do not want to comply. To the concurring judges, net neutrality merely means "if you say it, do it." Concurrence at 21. If that description were really true, the net neutrality rule would be a simple prohibition against false advertising. But that does not appear to be an accurate description of the rule. *See* Protecting and Promoting the Open Internet, 30 FCC Rcd. 5601, 5682 ¶ 187 (2015) (imposing various net neutrality requirements on an Internet service provider that "provides the capability" to access "all or

*Second*, the FCC suggests that *Turner Broadcasting* may not apply in the same way in the Internet context because the Internet service providers do not face the same kind of scarcity-of-space problem that a cable operator, for example, might face. In other words, the FCC argues that cable operators have fixed "space" and can carry only a limited number of channels; therefore, forced-carriage requirements would necessarily restrict First Amendment rights by depriving cable operators of their ability to carry some desired content. By contrast, for the Internet, forced-carriage requirements do not necessarily deprive Internet service providers of their ability to carry any of their desired content. There is space for everyone.

That argument, too, makes little sense as a matter of basic First Amendment law. First Amendment protection does not go away simply because you have a large communications platform. A large bookstore has the same right to exercise editorial discretion as a small bookstore. Suppose Amazon has capacity to sell every book currently in publication and therefore does not face the scarcity of space that a bookstore does. Could the Government therefore force Amazon to sell, feature, and promote every book on an equal basis, and prohibit Amazon from promoting or recommending particular

---

substantially all" content on the Internet) (italics omitted). It would be strange indeed if all of the controversy were over a "rule" that is in fact entirely voluntary and merely proscribes false advertising. In any event, I tend to doubt that Internet service providers can now simply say that they will choose not to comply with any aspects of the net neutrality rule and be done with it. But if that is what the concurrence means to say, that would of course avoid any First Amendment problem: To state the obvious, a supposed "rule" that actually imposes no mandates or prohibitions and need not be followed would not raise a First Amendment issue.

books or authors?  Of course not.  And there is no reason for a different result here.  Put simply, the Internet's technological architecture may mean that Internet service providers *can* provide unlimited content; it does not mean that they *must*.

Keep in mind, moreover, why that is so.  The First Amendment affords editors and speakers the right *not* to speak and *not* to carry or favor unwanted speech of others, at least absent sufficient governmental justification for infringing on that right.  *See, e.g.*, *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781, 796-97 (1988); *Pacific Gas & Electric Co. v. Public Utilities Commission of California*, 475 U.S. 1, 16 (1986) (plurality opinion); *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 256-58 (1974).  That foundational principle packs at least as much punch when you have room on your platform to carry a lot of speakers as it does when you have room on your platform to carry only a few speakers.

In short, the Supreme Court's *Turner Broadcasting* decisions mean that Internet service providers possess a First Amendment right to exercise their editorial discretion over what content to carry and how to carry it.  To be sure, the *Turner Broadcasting* decisions have sparked great controversy because they have constrained the Government's ability to regulate the communications marketplace.  *See, e.g.*, Susan Crawford, *First Amendment Common Sense*, 127 Harv. L. Rev. 2343, 2345 (2014); Stuart Minor Benjamin, *Transmitting, Editing, and Communicating: Determining What "The Freedom of Speech" Encompasses*, 60 Duke L.J. 1673, 1682 (2011); Moran Yemini, *Mandated Network Neutrality and the First Amendment: Lessons from* Turner *and a New Approach*, 13 Va. J.L. & Tech. 1, 38 (2008).  Those critics advance very forceful arguments.  Perhaps the Supreme Court will someday overrule or narrow those cases.

But unless and until that happens, lower courts must follow the Supreme Court. The *Turner Broadcasting* cases were landmark decisions that were intended to (and have) marked the First Amendment boundaries for communications gatekeepers in the 21st century. And under those decisions, the First Amendment does not allow the FCC to treat Internet service providers as mere pipeline operators rather than as First Amendment-protected editors and speakers.[9]

B

In light of the *Turner Broadcasting* decisions, Internet service providers have First Amendment rights. Of course, under the Supreme Court's case law, First Amendment rights are not always absolute: The Government may sometimes infringe on First Amendment rights if the Government shows a sufficient justification for doing so.

*Turner Broadcasting* establishes that, to impose content-neutral regulations on Internet service providers, the Government must satisfy the intermediate scrutiny test. To

---

[9] The concurrence in the denial of rehearing en banc notes that the cable trade association NCTA has not raised a First Amendment argument. But other Internet service providers have raised the First Amendment argument in this and other forums. And NCTA itself has previously argued that net neutrality obligations violate the First Amendment. *See, e.g.*, National Cable & Telecommunications Association, Comment Letter on Preserving the Open Internet 49-64 (Jan. 14, 2010). Moreover, the concurrence's point reflects a misunderstanding of who NCTA now is. NCTA represents content providers as well as cable operators. And content providers obviously have little interest in advocating for the First Amendment rights of Internet service providers and video programming distributors. That presumably explains NCTA's current silence on the First Amendment issue.

satisfy the intermediate scrutiny test, the Government's regulation must promote a "substantial governmental interest," be "unrelated to the suppression of free expression," and impose a restriction on First Amendment rights that "is no greater than is essential to the furtherance of that interest." *Turner Broadcasting*, 512 U.S. at 662 (internal quotation mark omitted) (quoting *United States v. O'Brien*, 391 U.S. 367, 377 (1968)).

Does the FCC's net neutrality rule satisfy intermediate scrutiny?  The answer is no.

In the abstract, the intermediate scrutiny test is somewhat question-begging (as is the strict scrutiny test, for that matter). The test almost necessarily calls for common-law-like decisions articulating and recognizing exceptions and qualifications to constitutional rights.  In this particular context, however, the Supreme Court has already applied the intermediate scrutiny test in a way that provides relatively clear guidance for lower courts.

Applying intermediate scrutiny, the *Turner Broadcasting* Court held that content-neutral restrictions on a communications service provider's speech and editorial rights may be justified if the service provider possesses "bottleneck monopoly power" in the relevant geographic market.  *Id.* at 661; *see also id.* at 666-67; *Turner Broadcasting II*, 520 U.S. 180 (controlling opinion of Kennedy, J.).[10]  But absent a demonstration of a company's market power in the relevant geographic market, the Government may not interfere with a

---

[10] In *Turner Broadcasting II*, Justice Kennedy's opinion for four justices was controlling because it represented the "position taken by those Members who concurred in the judgment[] on the narrowest grounds."  *Marks v. United States*, 430 U.S. 188, 193 (1977).

cable operator's or an Internet service provider's First Amendment right to exercise editorial discretion over the content it carries. *See Comcast Cable Communications, LLC v. FCC*, 717 F.3d 982, 993 (D.C. Cir. 2013) (Kavanaugh, J., concurring); *Cablevision Systems Corp. v. FCC*, 597 F.3d 1306, 1323 (D.C. Cir. 2010) (Kavanaugh, J., dissenting).

At the time of the *Turner Broadcasting* decisions, cable operators exercised monopoly power in the local cable television markets. That monopoly power afforded cable operators the ability to unfairly disadvantage certain broadcast stations and networks. In the absence of a competitive market, a broadcast station had few places to turn when a cable operator declined to carry it. Without Government intervention, cable operators could have disfavored certain broadcasters and indeed forced some broadcasters out of the market altogether. That would diminish the content available to consumers. The Supreme Court concluded that the cable operators' market-distorting monopoly power justified Government intervention. Because of the cable operators' monopoly power, the Court ultimately upheld the must-carry statute. *See Turner Broadcasting II*, 520 U.S. at 196-208 (controlling opinion of Kennedy, J.).

The problem for the FCC in this case is that here, unlike in *Turner Broadcasting*, the FCC has not shown that Internet service providers possess market power in a relevant geographic market. Indeed, the FCC freely acknowledges that it has not even tried to demonstrate market power. The FCC's Order states that "these rules do not address, and are not designed to deal with, the acquisition or maintenance of market power or its abuse, real or potential." Protecting and

Promoting the Open Internet, 30 FCC Rcd. 5601, 5606 ¶ 11 n.12 (2015).[11]

Rather than addressing any problem of market power, the net neutrality rule instead compels private Internet service providers to supply an open platform for all would-be Internet speakers, and thereby diversify and increase the number of voices available on the Internet. The rule forcibly reduces the relative voices of some Internet service and content providers and enhances the relative voices of other Internet content providers.

But except in rare circumstances, the First Amendment does not allow the Government to regulate the content choices of private editors just so that the Government may enhance certain voices and alter the content available to the citizenry. As the Supreme Court stated in *Buckley v. Valeo*, in one of the most important sentences in First Amendment history: The "concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment." 424 U.S. 1, 48-49 (1976). The Court in *Turner Broadcasting* re-affirmed that *Buckley* principle, as have many other Supreme Court cases before and since. *See, e.g.*, *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 741 (2011); *Citizens United v. FEC*, 558 U.S. 310, 350 (2010); *Meyer v. Grant*, 486 U.S. 414, 426 n.7 (1988); *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 790-92 (1978).

---

[11] Because the FCC has not tried to show market power, I need not determine exactly what a market power showing would entail in this context with respect to market share and the like. In *Turner Broadcasting*, the Court relied on the fact that the cable operators possessed "bottleneck monopoly power." 512 U.S. at 661; *see also id.* at 666-67.

Consistent with that bedrock *Buckley* principle, *Turner Broadcasting* did not allow the Government to satisfy intermediate scrutiny merely by asserting an interest in diversifying or increasing the number of speakers available on cable systems. After all, if that interest sufficed to uphold must-carry regulation without a showing of market power, the *Turner Broadcasting* litigation would have unfolded much differently. The Supreme Court would have had little or no need to determine whether the cable operators had market power. But the Supreme Court emphasized and relied on the Government's market power showing when the Court upheld the must-carry requirements. *See Turner Broadcasting II*, 520 U.S. at 196-208 (controlling opinion of Kennedy, J.). Indeed, in *Turner Broadcasting II*, Justice Breyer specifically disagreed with the Court's emphasis on market power as the justification for the must-carry law. Justice Breyer would have held that the Government's interest in promoting a multiplicity of voices sufficed to satisfy intermediate scrutiny. *See id.* at 226 (Breyer, J., concurring in part). But the Court did not go that route.

To be sure, the interests in diversifying and increasing content are important governmental interests in the abstract, according to the Supreme Court. *See Turner Broadcasting*, 512 U.S. at 663. But absent some market dysfunction, Government regulation of the content carriage decisions of communications service providers is not *essential* to furthering those interests, as is required to satisfy intermediate scrutiny. *See id.* at 662 (Content-neutral regulation will be sustained "if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is *essential* to the furtherance of that

interest.") (emphasis added) (internal quotation marks omitted). If the relevant communications marketplace is a competitive market, the theory is that the marketplace itself will both generate and provide room for a diversity and multiplicity of voices, without a need or justification for Government interference with private editorial choices. That is the lesson of the critical sentence in *Buckley*; it is the lesson of *Turner Broadcasting*; and indeed, it is the lesson of the entire history of First Amendment and competition law.

Consider the implications if the law were otherwise. If market power need not be shown, the Government could regulate the editorial decisions of Facebook and Google, of MSNBC and Fox, of NYTimes.com and WSJ.com, of YouTube and Twitter. Can the Government really force Facebook and Google and all of those other entities to operate as common carriers? Can the Government really impose forced-carriage or equal-access obligations on YouTube and Twitter? If the Government's theory in this case were accepted, then the answers would be yes. After all, if the Government could force Internet service providers to carry unwanted content even absent a showing of market power, then it could do the same to all those other entities as well. There is no *principled* distinction between this case and those hypothetical cases.

In short, under *Turner Broadcasting*, the net neutrality rule flunks intermediate scrutiny because the FCC has not shown that Internet service providers possess market power in a relevant geographic market.[12] It is debatable, moreover,

---

[12] At a minimum, *Turner Broadcasting* requires the Government to show market power in order to satisfy intermediate scrutiny. But *Turner Broadcasting* seems to require even more from the Government. The Government apparently must also show that the market power would actually be used to disadvantage

whether the FCC could make such a market power showing in the current competitive marketplace. One leading scholar has explained that the presence of "vibrant competition" in the Internet service market makes it "difficult to see how any court could invoke the bottleneck rationale articulated in *Turner I* to justify greater intrusions into Internet providers' editorial discretion than would be permissible with respect to newspapers." Christopher S. Yoo, *Free Speech and the Myth of the Internet as an Unintermediated Experience*, 78 Geo. Wash. L. Rev. 697, 748, 749 (2010). In any event, the FCC did not try to make such a market power showing here.[13]

The net neutrality rule reflects a fear that the real threat to free speech today comes from private entities such as Internet service providers, not from the Government. For that reason, some say, the Government must be able to freely intervene in the market to counteract the influence of Internet service providers.

---

certain content providers, thereby diminishing the diversity and amount of content available. *See Turner Broadcasting*, 512 U.S. at 664-68; *Turner Broadcasting II*, 520 U.S. at 196-213 (controlling opinion of Kennedy, J.).

[13] Some defenders of net neutrality raise a slippery slope argument: If the First Amendment really bars the net neutrality rule, then the First Amendment would also bar Government regulation of telephone companies that connect person-to-person calls. That scary-sounding hypothetical is unpersuasive, however, because the telephone company is not engaged in carrying or making mass communications in those circumstances: "Mass-media speech implicates a broader range of free speech values that include interests of audiences and intermediaries, as well as speakers." Yoo, *Free Speech*, 78 Geo. Wash. L. Rev. at 701. The transmission of person-to-person communications does not implicate the same editorial discretion issues. So that slippery slope argument is not a persuasive reason to fear, or refrain from recognizing, Internet service providers' First Amendment rights.

That argument necessitates two responses. To begin with, the First Amendment is a restraint *on the Government* and protects private editors and speakers *from Government regulation*. The First Amendment protects the independent media and independent communications marketplace *against* Government control and overreaching.[14]

More to the point, the *Turner Broadcasting* cases already grant the Government ample authority to counteract the exercise of market power by private Internet service providers. If the Internet service providers have market power, then the Government may impose open-access or similar carriage obligations. In other words, if private Internet service providers possess market power, then *Turner Broadcasting* already gives the Government tools to confront that problem.

---

[14] Over the years, many highly respected academic commentators have questioned that vision of the First Amendment. They have advanced extremely thoughtful arguments. *See, e.g.*, CASS R. SUNSTEIN, DEMOCRACY AND THE PROBLEM OF FREE SPEECH (1993); Robert Post & Amanda Shanor, *Adam Smith's First Amendment*, 128 Harv. L. Rev. F. 165 (2015). But the traditional laissez-faire model still reflects the basic tenor of the Supreme Court's First Amendment jurisprudence. Indeed, that approach to the First Amendment seems to have grown only stronger in recent decades. *See, e.g.*, *Brown*, 564 U.S. 786; *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011); *United States v. Stevens*, 559 U.S. 460 (2010); *Citizens United*, 558 U.S. 310; *Thompson v. Western States Medical Center*, 535 U.S. 357 (2002); *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001); *Greater New Orleans Broadcasting Association, Inc. v. United States*, 527 U.S. 173 (1999); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996); *Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995). As a lower court, we of course must take the Supreme Court's jurisprudence as we find it.

Therefore, it is important to be crystal clear about one key point: The Supreme Court's First Amendment precedents *allow* the Government to impose net neutrality obligations on Internet service providers that possess market power. In that respect, *Turner Broadcasting* reached a middle ground. The Supreme Court did not go as far as some wanted in terms of protecting cable operators' editorial discretion even when the cable operators have market power. Some argued that a cable operator should receive the same First Amendment protections as a newspaper, whose editorial discretion is protected *even if the newspaper has market power*. *See Tornillo*, 418 U.S. 241. But the Court in *Turner Broadcasting* did not adopt that absolutist principle for cable operators.

Therefore, absent a showing of market power, the Government must keep its hands off the editorial decisions of Internet service providers. Absent a showing of market power, the Government may not tell Internet service providers how to exercise their editorial discretion about what content to carry or favor any more than the Government can tell Amazon or Politics & Prose what books to promote; or tell *The Washington Post* or the *Drudge Report* what columns to carry; or tell ESPN or the NFL Network what games to show; or tell *How Appealing* or *Bench Memos* what articles to feature; or tell Twitter or YouTube what videos to post; or tell Facebook or Google what content to favor.

On this record, the net neutrality rule violates the First Amendment. For that reason alone, the rule is unlawful, even apart from the rule's invalidity under the major rules doctrine discussed in Part I of this opinion.

\* \* \*

In the hierarchical court system established by Article III, a lower court must carefully follow Supreme Court precedent. If we faithfully apply current Supreme Court doctrine here, then this becomes a fairly straightforward case. First, Supreme Court precedent requires clear congressional authorization for an agency's major rule. *See Utility Air Regulatory Group v. EPA*, 134 S. Ct. 2427, 2444, slip op. at 19 (2014). The net neutrality rule is a major rule. But Congress has not clearly authorized the FCC to issue the net neutrality rule. The rule is therefore unlawful. Second, Supreme Court precedent establishes that Internet service providers have a First Amendment right to exercise editorial discretion over whether and how to carry Internet content. *See Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622 (1994). The Government may interfere with that right only if it shows that an Internet service provider has market power in a relevant geographic market. But the FCC has not shown (or even attempted to show) market power here. On this record, therefore, the rule violates the First Amendment.

For those two alternative and independent reasons, the net neutrality rule is unlawful and must be vacated. I respectfully disagree with the panel's contrary decision and, given the exceptional importance of the issue, respectfully dissent from the denial of rehearing en banc.